# Illinois Official Reports

## Appellate Court

---

### *People v. Knox*, 2014 IL App (1st) 120349

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VANDAIRE KNOX, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-12-0349 |
| Filed | September 30, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where defendant's guilty plea to first degree murder was vacated by the appellate court based on his postplea counsel's failure to comply with the requirements of Supreme Court Rule 604(d) and his subsequent conviction for first degree murder after a jury trial was reversed on the ground that the trial court's failure to rule on his motion *in limine* to bar the use of his prior felony convictions for impeachment until after he testified was reversible error, his conviction for first degree murder after a second jury trial was upheld over his contentions that his impeachment with his prior felonies was improper and that his sentence was excessive, since the prior felonies at issue were admissible at the time of defendant's first trial, and even though the 10-year *Montgomery* period normally would have barred the use of the felonies at defendant's second jury trial conducted 11 years after the shooting, under the fundamental fairness doctrine set forth in *Reddick*, the felonies were admissible for impeachment in that trial, and defendant failed to establish that his sentence was excessive. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 00-CR-2613; the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Jennifer L. Bontrager, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Anthony O'Brien, and Iris G. Ferosie, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justices Neville and Mason concurred in the judgment and opinion.

## OPINION

¶ 1  Following a jury trial, defendant Vandaire Knox was convicted of first degree murder and was sentenced to 45 years' imprisonment. Defendant appeals his conviction and the sentence imposed thereon, arguing: (1) the circuit court erred in permitting the State to impeach him with his three prior felony convictions; and (2) the 45-year sentence imposed by the circuit court is excessive. For the reasons set forth herein, we affirm the judgment of the circuit court.

¶ 2                              BACKGROUND
¶ 3                              Guilty Plea
¶ 4  On December 18, 1999, Rodney Clifton was shot and killed. Defendant was subsequently charged with first degree murder in connection with Clifton's death. Thereafter, on May 20, 2002, defendant entered a negotiated guilty plea to the charge of first degree murder in exchange for a sentence of 35 years' imprisonment. Defendant, however, later sought to vacate his guilty plea, arguing that he had been deprived of his constitutional right to effective assistance of trial counsel during his plea proceedings. Defendant was appointed new postplea counsel, who filed a supplemental motion to withdraw his guilty plea. Postplea counsel, however, did not file a certificate of compliance in accordance with Illinois Supreme Court Rule 604(d) (eff. July 1, 2006). The circuit court denied defendant's motion to withdraw his plea, and defendant appealed. On appeal, this court remanded the cause to the circuit court for vacatur of defendant's plea. In an unpublished Rule 23 order, we found that vacatur was warranted because postplea counsel had not strictly complied with the mandatory certificate requirement set forth in Rule 604(d). *People v. Knox*, No. 1-03-1010 (2004) (unpublished order under Supreme Court Rule 23).

¶ 5                              First Jury Trial
¶ 6  Following remand, defendant withdrew his guilty plea. Defendant then elected to proceed by way of a jury trial. Prior to that trial, defendant filed a motion *in limine* seeking to bar the State from using his prior felony convictions to impeach him. The circuit court, however, refused to rule on defendant's motion until after defendant testified, reasoning that such a

ruling was premature absent defendant's decision to testify. During the trial that ensued, defendant did elect to exercise his right to testify and, thereafter, the circuit court permitted the State to impeach defendant with his prior convictions. At the conclusion of defendant's trial, the jury convicted him of first degree murder and he was subsequently sentenced to 45 years' imprisonment. Defendant appealed, challenging his conviction on several grounds, including the circuit court's delayed ruling on his motion *in limine*. In another unpublished Rule 23 order, this court reversed his conviction, finding that "the trial court's failure to rule on the defendant's motion *in limine* until after he testified amounted to reversible error." *People v. Knox*, No. 1-06-3278, order at 15-16 (2009) (unpublished order under Supreme Court Rule 23). Finding this issue dispositive, we remanded the cause for a new trial.

¶ 7                                   Second Jury Trial

¶ 8      On remand, the parties once again prepared for trial. Prior to the start of defendant's second jury trial, the State filed a motion *in limine*, seeking the circuit court's ruling on the admissibility of three of defendant's prior felony convictions. After hearing arguments from both parties, the court ruled that defendant could be impeached with his prior convictions if he elected to testify. Following the court's ruling on pretrial motions, the cause proceeded to trial.

¶ 9      Misty Allen testified that she was Rodney Clifton's girlfriend in December 1999. They met at Schwab Rehabilitation Center, where they both worked. On December 19, 1999, Allen had plans to go to Vanity Nightclub (Vanity), located at 5005 West North Avenue, with her cousin, Sonya, and Ondrell Schaffer, her children's uncle. Allen explained that Schaffer was the younger brother of Reginald Schaffer, the father of her two children, and was often referred to by his nickname: "Country." Allen testified that shortly after midnight Country arrived on the block in which she lived. He was driving a red two-door Chevrolet Beretta, and defendant, whom Allen had known for approximately 10 years, was a passenger in Country's car. When they arrived, Allen was sitting in Clifton's car, a maroon four-door Chevy Malibu. Allen explained that Clifton had stopped by her apartment unannounced after he had been drinking and that he was not supposed to accompany her to Vanity that night. She was simply sitting in his car waiting for her friends to arrive.

¶ 10      After Country and defendant arrived, defendant walked over to Clifton's car, approached the passenger side where Allen was sitting, pulled on the door handle, and said: "What you doing in the car with this nig***? You supposed to be going out with us. Why you in the car with this nig***?" Allen recalled that Clifton became upset and told defendant to "let [his] car door go." Clifton got out of the car and the two men then "had a little tussle." After it was broken up, Clifton returned to his car and defendant returned to Country's car. The two vehicles then drove toward Vanity. On the way to the nightclub, Allen was a passenger in her boyfriend's car and stated that he and defendant continued "hollering and cussing" at each other. At one point, Clifton stopped his car in the street and exited the vehicle. Defendant then exited Country's car and walked toward Clifton. Defendant was holding a metal steering wheel locking device known as a "Club." Clifton was able to get the Club out of defendant's hands and Allen and Country were able to break the two men apart. Once the two men were back in their respective vehicles, both cars continued driving toward Vanity.

¶ 11      Clifton and Allen arrived at the nightclub first and Clifton stopped his vehicle in front of the club. Although Clifton was dropping her off and was not planning to enter the nightclub, Allen testified that she remained seated in the front passenger seat of her boyfriend's car and

waited for her cousin and Country to arrive. After waiting for approximately 10 minutes, a grey station wagon "pulled up fast" and stopped in front of Clifton's car. The car was driven by another one of Allen's acquaintances, Linnell Little. She saw defendant exit Little's car and begin walking toward Clifton's car. Defendant was carrying a gun. Allen immediately exited Clifton's car and approached defendant, urging him repeatedly "please don't do this." Defendant, however, raised the gun, pointed at Clifton and started firing at Clifton's window. Allen saw Clifton raise his arms to protect himself. She estimated that defendant fired "about six times" at her boyfriend.

¶ 12    After defendant stopped firing, Allen began screaming at him, calling him a "pus*** mother fuc***." In response, defendant told her that he was "sorry" and walked back to Little's car. As it drove off, Allen picked up the Club that Clifton had taken from defendant during their earlier confrontation and threw it at the rear window, breaking it. Allen returned to Clifton's vehicle and found her boyfriend unresponsive. She ran into nightclub and asked someone to call "911." After emergency medical personnel and police officers arrived at the scene, Allen identified defendant as the person who shot and killed her boyfriend.

¶ 13    On cross-examination, Allen denied that Clifton had a gun in his car at the time he was shot or that he had threatened defendant with a gun at any time that evening. She acknowledged, however, that defendant and Clifton had screamed a lot of words at each other during their altercations that night and that she "didn't hear everything" that had been said. To Allen's knowledge, defendant and Clifton had not met prior to that night.

¶ 14    Melissa Stiler testified that she was Linnell Little's "steady girlfriend" in December 1999. At the time, Stiler "knew of" defendant because he was someone with whom Little had grown up. She recalled that she was with Little "in the late evening hours" of December 18, 1999. He picked her up from her grandmother's house in his gray station wagon and they drove around. When they reached the area of Lamont and Augusta, Stiler recalled seeing people standing around, including Ondrell Schaffer, whom she also knew as Country, and defendant. Country was also someone that her boyfriend knew from the neighborhood. Stiler also recalled seeing several cars parked nearby, including a red car, a darker maroon vehicle, and a white vehicle. Once Little recognized his friends, Stiler testified that he stopped the car and had a conversation with defendant and Country. Stiler was not party to the conversation, but she overheard the men "talking about what they were going to do *** for the rest of the night and where they were going to go." She specifically recalled overhearing that the men were going to Vanity. After Little said that he "wasn't going to go," Stiler testified that he returned to the car and they began driving toward Little's mother's house located near Latrobe and Division.

¶ 15    As they were driving, Country's red vehicle drove up behind them and began honking. Country and defendant were both yelling Little's name so he stopped the car. Once he did so, defendant ran up and "got into the backseat of the station wagon." When Stiler glanced at defendant, she "didn't see any injuries or any bleeding to his face." She recalled that defendant seemed to be "very excited" and that he "was loud and talking fast." Once he entered the car, defendant instructed Little to take him to Vanity. Little agreed and pulled up to the nightclub. He stopped his car on an angle in front of a maroon vehicle. As soon as the car stopped, defendant "got out of the backseat but left the door open." Stiler heard gunshots "almost instantaneously" coming from behind her. After the shots stopped, Stiler heard a woman's voice, yelling "pus*** mother fuc***." She then heard defendant say, "I'm sorry Misty." Once defendant reentered Little's car, Stiler heard the rear window shatter and Little began driving

- 4 -

away from the nightclub. After Little had driven a short distance, Stiler asked to be let out of the car immediately. Once she exited Little's car, Stiler took a bus back to her grandmother's house.

¶ 16    Stiler testified that defendant was only in Little's car for approximately five minutes before the shooting. Although defendant appeared excited he did not say anything about wanting to confront or hurt anybody. In addition, although Stiler heard the gunshots she testified that she "did not see the shooting." She confirmed that she was no longer in contact with Little.

¶ 17    Linnell Little was legally unavailable to testify at the time of defendant's second trial, but the court ruled that the testimony that he provided at a prior proceeding could be read to the jury. In his prior testimony, Little acknowledged having prior criminal convictions, including narcotics convictions and an unlawful use of a weapon by a felon conviction. He further acknowledged that he had grown up with defendant. He testified that he spent the late evening hours of December 18, 1999, "riding with" Melissa Stiler, his girlfriend at the time, in a gray Pontiac station wagon. Sometime after midnight, he drove over to his cousin Sean's house, which was located in the area of Lamont and Augusta. When he arrived in the area, Little saw several parked cars including a red Beretta, a white car containing two female passengers, and a "dark" car. Little immediately recognized the red Beretta, explaining that it belonged to Country, another one of his long-time acquaintances from the neighborhood. Little saw Country sitting in the driver's seat of the Beretta and defendant sitting in the passenger seat. After parking his vehicle, Little walked toward defendant and Country and the men began talking in the middle of the street. He learned that they were going to go to Vanity. As they were talking, Little saw Misty get out of the white car and walk to, and enter, the dark car in which a male driver was sitting. Defendant had also seen Misty enter the dark vehicle and Little heard him ask her, "what you getting in the car with that nig*** for?" Little told defendant to "leave it alone." He then returned to his vehicle and began driving toward his mother's house.

¶ 18    As Little neared the intersection of Latrobe and Augusta, Country's vehicle pulled up behind him and repeatedly sounded its horn. When Little stopped his vehicle, defendant exited Country's car and entered his backseat. Defendant told Little to "run [him] up to Vanity's," and Little agreed to do so. He testified that neither he nor Melissa talked to defendant on the way to the nightclub. When they arrived, Little recalled that he maneuvered his vehicle in front of a dark car, the same dark-colored car that he had seen earlier in the area of Lamont and Augusta. Defendant "hopped out" of Little's car before it completely stopped and Little immediately heard a series of "eight or more" gunshots. Little "ducked" and heard his "back window bust out." He also heard defendant say, "I'm sorry Misty." Defendant then jumped back into Little's car and Little immediately drove away from Vanity. Little recalled that he and Melissa were panicky and that he let Melissa out of the car. He then dropped defendant off somewhere on Monitor Avenue. Little testified that he and defendant did not talk to each other while they were alone together in the car. After dropping defendant off, Little talked to some family members about what had occurred and contacted an attorney. Little subsequently went to speak to detectives at the Chicago police department about the events that had transpired.

¶ 19    Little confirmed that he never saw any marks or signs of bruising on defendant's face prior to the shooting. After the shooting, defendant appeared to be pale and in shock. Little testified that he did not anticipate that any violence was going to take place when he drove defendant to Vanity. Although he acknowledged stopping his car in front of Clifton's dark vehicle, Little

denied that he had done so to prevent Clifton from being able to drive away. Little further denied that he had seen a gun on defendant's person on the night of the shooting.

¶ 20    Carl Brasic, a forensic investigator with the Chicago police department, testified that he received an assignment at approximately 1 a.m. on December 19, 1999, to process a murder scene at 5005 West North Avenue. When he arrived at the scene, he "saw a maroon vehicle parked at an angle near a bus stop with numerous police cars and police officers around it and there was yellow crime scene tape around the vehicle." The maroon vehicle was a 1998 Chevy Malibu. Investigator Brasic also observed that Clifton's body was in the driver's seat of the vehicle. After speaking with detectives, Investigator Brasic began processing the scene. He recovered six cartridge casings from the street near Clifton's car and two bullets from Clifton's vehicle. No firearms were recovered from Clifton's vehicle. In addition to the bullets and cartridge casings, Investigator Brasic also recovered glass and a 59-inch piece of vehicle window trim. The evidence was all inventoried in accordance with police protocol and was sent in a sealed condition to the Illinois state crime lab for analysis.

¶ 21    Later that morning, Investigator Brasic received an order to report to an address located at 5414 West Kamerling, which was approximately six blocks away from Vanity. He arrived at that location at approximately 2:45 a.m. When he arrived at that location, he saw "an older model gray Pontiac station wagon" with a broken rear window and broken window trim. Inside of the car was a yellow Club steering wheel security mechanism. Investigator Brasic testified that the window trim hanging off the Pontiac "looked similar" to the trim that he recovered in front of Vanity.

¶ 22    Doctor James Filkins, a forensic pathologist employed by the Cook County medical examiner, conducted Rodney Clifton's autopsy. The autopsy included both external and internal examinations, the results of which revealed that Clifton had suffered eight gunshot wounds to his body as well as several skin lacerations to his head and face. The gunshot wounds were found on Clifton's upper body, including his arms, chest, and head. Doctor Filkins agreed that someone who was shot while seated in a vehicle would likely have gunshot wounds in similar locations on his body. Although he was unable to identify the source of Clifton's lacerations, he testified that they could have been caused by broken pieces of glass. Doctor Filkins was able to recover three bullets from Clifton's body. Based on his findings, Doctor Filkins opined that Clifton died as a result of multiple gunshot wounds and identified the manner of death as homicide.

¶ 23    Chicago police officer Patricia Wiggins testified that she was a long-time friend of defendant's aunt and grandmother. On December 19, 1999, Officer Wiggins received a phone call from defendant's grandmother. Shortly thereafter, she received a phone call from defendant. Although defendant would not reveal the location from which he was calling, Officer Wiggins was able to identify the phone number defendant was using to place the call. She subsequently relayed that phone number to Detective Hart at Area 5. Later that morning, Officer Wiggins reported to 1336 North Monitor, where defendant was apprehended and taken into custody. She did not observe any signs of swelling or bruising to defendant's face at that time.

¶ 24    After presenting the aforementioned evidence, the State rested its case-in-chief. Defendant moved for a directed verdict, but the court denied the motion, reasoning: "The evidence at this point, the jurors could accept that the defendant shot the victim a number of times and that the offense at this juncture is first-degree murder."

¶ 25    Defendant elected to exercise his constitutional right to testify on his own behalf. He acknowledged that in the late evening hours of December 18, 1999, he was with his friend Ondrell Schaffer, whose nickname was Country. When they arrived in the area of Lamont and Augusta, defendant recalled seeing Misty Allen exit a white car and walk to a maroon vehicle. Defendant called out to her and asked about her ex-boyfriend, Country's brother, but she did not respond. Clifton, the male occupant of the maroon car, then called defendant a "nig***" and the two men began exchanging words. Linnell Little, another one of defendant's friends who was also in the area, told defendant to "leave it alone" and defendant did so. He and Country then began driving to Vanity, where they intended to spend the rest of their night. When Country stopped his vehicle at the stop sign located at the intersection of Lamont and Thomas, Clifton drove up next to them and told defendant that he was "going to do something to [him]" the next time that they saw each other. Defendant told Country to "pull off," and Country began driving again.

¶ 26    As Country drove, Clifton continued following them. When the vehicles reached the intersection of Potomac and Long, Clifton "shot around [them] and cut [them] off." Defendant testified that Clifton then exited his vehicle and approached the passenger side of Country's vehicle where he was sitting. As Clifton was walking in his direction, defendant reached into the backseat of Country's car and retrieved a metal Club. By that point, however, Clifton had opened the passenger door, seized the Club from defendant's hands, and punched defendant in his face. As defendant was attempting to exit the car, Clifton punched defendant in the mouth and then pushed the door against defendant's lower legs. When defendant was finally able to exit Country's car, the two men began "tussling." As the men were fighting, Misty approached them and began yelling at Clifton to leave defendant alone and to take her back home. Misty then grabbed Clifton's arm and led him back to his car, and they drove off. Defendant, in turn, returned to Country's vehicle and checked his face in the car's mirror and saw that it was becoming swollen. He yelled at Country for not coming to his aid when Clifton had attacked him. When defendant saw his friend Little's car driving through the area, defendant exited Country's car and flagged Little down. Defendant then told Little what had happened and Little invited him to "get in" the car. Defendant then entered the backseat of Little's gray station wagon.

¶ 27    Although defendant did not ask Little to drive him to Vanity, Little began driving in that direction. They did not converse during the drive, but defendant testified that as they neared the nightclub, Little reached back with a gun in his hand. Defendant "grabbed it and set it on the seat." When Little stopped his car in front of Vanity, defendant got out. At that point, he noticed that Clifton was also at the club. He was standing outside of his maroon vehicle talking to somebody. When Clifton locked eyes with defendant, Clifton started to enter his car and appeared to be "reaching for something." Defendant, in turn, retrieved the gun from the backseat of Little's car. Defendant explained that he did so because he "was scared because [Clifton] had just got through attacking [him] and [he] didn't know what [Clifton] was reaching in the car to get or what he was doing." Defendant then "just got to shooting" in Clifton's direction. Although he could not recall how many shots that he fired, he testified that the shooting did not last "that long." Once he finished shooting, defendant told Misty he was "sorry," got into Little's car and closed the door. Before Little pulled away, the back window shattered and "glass got to flying" at defendant.

¶ 28      After driving away from Vanity, Little stopped the car to drop off Melissa near a bus stop. Little then drove defendant somewhere on Kamerling Avenue. At that point, Little told defendant to give him the gun and get out of the car. Defendant complied. Little also exited the vehicle and both men got into another car that was owned by one of their friends. They left the gray station wagon parked on Kamerling Avenue. Defendant was dropped off at his girlfriend's house located on Monitor. After spending the night with her, defendant called his grandmother. Once he finished that call, defendant placed another call to Patricia Wiggins, who was a "friend of the family," whom defendant had known all of his life. Wiggins instructed defendant to turn himself into police, but he declined to do so because he "didn't want to go back to jail." Defendant explained that he had been convicted of narcotics offenses in 1996 and 1998. He had also been convicted of the offense of unlawful use of a weapon by a felon in 1996. After a brief conversation with Wiggins, defendant saw police officers arrive and congregate outside of his girlfriend's apartment. He placed another phone call to Wiggins and she told him to stay put and wait for her to arrive. Shortly after Wiggins arrived at the scene, defendant surrendered and was taken to the police station.

¶ 29      On cross-examination, defendant acknowledged that when he arrived at Vanity and saw that Clifton was in front of the nightclub, he did not tell Little to drive away. Instead, he reached into Little's car, grabbed Little's gun, pointed the gun at Clifton and shot Clifton eight times. He further acknowledged that Clifton never pointed a gun in his direction or threatened him with a gun at any time that evening. Defendant did, however, feel that he had been disrespected by Clifton that night. Although defendant recalled that Clifton had punched him during their earlier altercations, defendant did not remember how many times Clifton had struck him, but testified that his face had started to swell. Defendant did not know whether the swelling would be apparent to people who did not know him. Defendant denied that he ever asked Little to drive him to Vanity or that he went to the nightclub with the intention to confront Clifton.

¶ 30      In addition to defendant's testimony, the defense proceeded by way of stipulation. Pursuant to that stipulation, Detective Hart would testify that in the early morning hours of December 19, 1999, he reported to the scene of the shooting. When he arrived, he observed the crime scene, which "consist[ed] of the victim's vehicle angled in the sign post on the corner of 5001 West North Avenue. The victim was seated in the driver's seat slumped to the right and back over [a] raised armrest and [the] victim's feet were jutting out over the driver's door."

¶ 31      Once the defense rested, the court granted the State's motion to admit certified copies of defendant's prior convictions into the record. Thereafter, the parties delivered closing arguments. After receiving relevant instructions, the jury commenced deliberations. Following those deliberations, the jury returned with a verdict finding defendant guilty of the offense of first degree murder. At the sentencing hearing that followed, the circuit court heard the arguments that the parties advanced in aggravation and mitigation, and ultimately sentenced defendant to 45 years' imprisonment. Defendant's posttrial and postsentencing motions were denied and this appeal followed.

¶ 32                                    ANALYSIS
¶ 33                               Prior Convictions
¶ 34      On appeal, defendant raises no challenge to the sufficiency of the evidence; rather he argues that the circuit court erred in permitting the State to impeach him with his three prior

felony convictions. He observes that he was convicted of two felonies in 1996 and that judgment on his third felony conviction was entered in 1998. Defendant argues that at the time of his second jury trial in 2010, each of his three prior felony convictions fell "outside of the ten-year limitation of admission established in *People v. Montgomery*, 47 Ill. 2d 510 [(1971),] and *People v. Naylor*, 229 Ill. 2d 584 (2008)," and thus the court deprived him of a fair trial when it allowed the State to impeach him with those three untimely convictions.

¶ 35    The State, in turn, denies that the impeachment of defendant with his prior felony convictions deprived him of his constitutional right to a fair trial. Although the convictions exceeded the 10-year time limitation set forth in *Montgomery* at the time of defendant's second jury trial, the State observes that those convictions did fall within the requisite time limitation at the time of defendant's 2002 guilty plea and his first jury trial, which was conducted in 2006. Because the convictions were admissible in the earlier proceedings, the State argues that "fundamental fairness" required the State to be allowed to introduce defendant's prior convictions for the purpose of impeaching his credibility at his 2010 trial.

¶ 36    In criminal trials, a defendant's criminal convictions are "generally inadmissible to demonstrate propensity to commit the charged crime." *People v. Donoho*, 204 Ill. 2d 159, 170 (2003); see also *People v. Naylor*, 229 Ill. 2d 584, 594 (2008) ("the record of the defendant's prior conviction is not introduced, and cannot be considered, for the purpose of proving the defendant's guilt or innocence of the [charged offense]"). In certain circumstances, however, prior convictions may be admissible for impeachment purposes to attack a witness's credibility. *People v. Mullins*, 242 Ill. 2d 1, 14 (2011); *Naylor*, 229 Ill. 2d at 594. In *People v. Montgomery*, 47 Ill. 2d 510 (1971), our supreme court set forth the factors to consider as to whether a prior conviction may be admitted for the express purpose of attacking the credibility of a defendant or other witness. Pursuant to the *Montgomery* rule, a prior conviction may be admitted if: (1) the crime was punishable by death or a term of imprisonment in excess of one year, or the crime involved dishonesty or false statements regardless of the punishment imposed; (2) less than 10 years has elapsed since the date of conviction of the prior crime or release of the witness from confinement, whichever date is later; and (3) the probative value of admitting the prior conviction outweighs the danger of unfair prejudice. *Montgomery*, 47 Ill. 2d at 516; *Mullins*, 242 Ill. 2d at 14. Ultimately, "the *Montgomery* rule limits the potential for abuse where the accused elects to take the witness stand, but it still makes prior convictions relevant to the issue of his credibility in part because 'it would be unfair to permit the accused to appear as a witness of blameless life.' " *People v. Medreno*, 99 Ill. App. 3d 449, 451 (1981) (quoting Edward W. Cleary & Michael H. Graham, Handbook of Illinois Evidence § 609.1, at 284 (1979)).

¶ 37    Although the ultimate decision whether to admit a defendant's prior convictions for purposes of impeachment is within the sound discretion of the circuit court, the determination as to whether a conviction falls within *Montgomery*'s 10-year requirement is not a matter of discretion. *Naylor*, 229 Ill. 2d at 601; *Mullins*, 242 Ill. 2d at 15. Rather, the supreme court has specified that "*Montgomery*'s 10-year time limit should be calculated in relation to the date of the defendant's trial." *Naylor*, 229 Ill. 2d at 602.

¶ 38    The 10-year requirement, however, is not without limitation. In *Naylor*, the supreme court recognized that the " '[t]he philosophy underlying this time limitation is that 10 years of conviction-free living demonstrates sufficient rehabilitation in the witness' credibility to attenuate any probative value, thus making those prior convictions inadmissible.' " *Naylor*,

229 Ill. 2d at 601 (quoting *People v. Medreno*, 99 Ill. App. 3d 449, 451 (1981)). Accordingly, where there is evidence that a defendant is drawing out legal proceedings, the court held that "the running of the 10-year time limit could be tolled on the ground that a defendant's 'effort to manipulate the judicial system negates the positive inference supposedly to be drawn from ten years of law abiding behavior.' " *Naylor*, 229 Ill. 2d at 601 (quoting 28 Charles A. Wright & Victor J. Gold, Federal Practice and Procedure § 6136, at 261 (1993)).

¶ 39    Another exception to *Montgomery*'s 10-year rule was established in *People v. Reddick*, 123 Ill. 2d 184 (1988). In that case, the trial court prevented the defendant from impeaching a prosecution witness with a prior felony conviction, finding that the felony conviction was too old. The trial court's ruling, however, was based on a mathematical error, as the witness's conviction did fall within 10 years of the defendant's trial. In remanding the cause for a new trial, the supreme court recognized that the defendant's second trial would occur more than 10 years after the witness's felony conviction, but stated that *Montgomery*'s time bar could not be used to prevent the defendant from impeaching the State's witness with that conviction. The court explained its rationale as follows: "If the evidence should have been admitted previously, then it must be admitted on retrial. [The witness] will likely be attempting to track his prior testimony, and fundamental fairness dictates that defendant be allowed to impeach him in the same manner that defendant should have been permitted to impeach him in the initial trial." *Reddick*, 123 Ill. 2d at 203. The fundamental fairness doctrine set forth in *Reddick* has since been employed by courts to permit the admission of a defendant's prior convictions for impeachment purposes during subsequent legal proceedings as long as the defendant's convictions occurred within 10 years of the initial proceeding. See *People v. Jackson*, 299 Ill. App. 3d 104, 113 (1998).

¶ 40    Here, there is no dispute that defendant's prior felony convictions occurred more than 10 years prior to the start of his second jury trial on December 7, 2010. Defendant was convicted of possession of a controlled substance with intent to deliver and unlawful use of a weapon by a felon on February 15, 1996. He was sentenced to three years' imprisonment and two years' imprisonment, respectively, and was paroled on both offenses on November 5, 1997. Thereafter, he was convicted of possession of a controlled substance on November 5, 1998, and was sentenced to 30 months' imprisonment. He received credit for time served and was paroled prior to the December 19, 1999, shooting of Clifton. There is also no dispute that each of those three prior convictions fell within the 10-year *Montgomery* period at the time of defendant's first jury trial, which commenced on August 1, 2006. See *Montgomery*, 47 Ill. 2d at 516 (a prior conviction is admissible if less than 10 years has elapsed since the date of conviction of the prior crime *or* release of the witness from confinement, whichever date is later); *Naylor*, 229 Ill. 2d at 602 ("*Montgomery*'s 10-year time limit should be calculated in relation to the date of the defendant's trial.").

¶ 41    In finding defendant could be impeached with those prior convictions during his second jury trial, conducted 11 years after the shooting occurred, the circuit court relied on *Reddick*'s fundamental fairness exception, reasoning: "In this case, Knox was tried in 2006, I believe it was August 2006. At that time, the three convictions that I felt were admissible against him based on *Montgomery* were admissible. And even though they would now be more than ten years, they were admissible back in 2006 when the trial in fact of Vandaire Knox took place." The court further found that the "probative value of the defendant's prior convictions

- 10 -

outweigh[s] any prejudicial effect because the issue is one of credibility," given that the crux of the trial would be "the State's version of events versus Vandaire Knox's version of events."

¶ 42    After reviewing the record and relevant case law, we do not find that the circuit court erred in admitting defendant's prior convictions at his second jury trial; rather, we conclude that the court properly applied *Reddick*'s fundamental fairness exception. In so finding, we necessarily reject defendant's argument that *Naylor* "implicitly" overruled its previous decision in *Reddick*. *Naylor* merely sought to clarify the proper calculation of *Montgomery*'s 10-year requirement and involved no application of fundamental fairness exception that it recognized in *Reddick*. We therefore conclude that the admission of defendant's prior felony convictions did not deprive him of his right to a fair trial.

¶ 43                                        Sentence

¶ 44    Defendant next challenges his sentence. He argues that the 45-year-sentence imposed by the circuit court is excessive in light of the circumstances of the offense and the existence of mitigating factors. Specifically, defendant emphasizes that he was gainfully employed at the time of the crime, that his prior convictions did not involve violence, and that he expressed remorse for his actions. Given these mitigating factors, defendant maintains that his sentence "does not reflect an appropriate balancing of rehabilitation and retribution as required by the federal and Illinois Constitutions," and requests that this court reduce his sentence, or alternatively, remand this cause for a new sentencing hearing.

¶ 45    The State, in turn, contends that the record reflects that the circuit court carefully "considered all proper aggravating and mitigating factors," including defendant's rehabilitative potential when it imposed his sentence. As such, the State argues that the circuit court did not abuse its discretion when it sentenced defendant to a 45-year prison term and thus defendant's sentence should be upheld.

¶ 46    The Illinois Constitution requires a trial court to impose a sentence that achieves a balance between the seriousness of the offense and the defendant's rehabilitative potential. Ill. Const. 1970, art. I, § 11; *People v. Lee*, 379 Ill. App. 3d 533, 539 (2008). To find the proper balance, the trial court must consider a number of aggravating and mitigating factors including: "the nature and circumstances of the crime, the defendant's conduct in the commission of the crime, and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education." *People v. Maldonado*, 240 Ill. App. 3d 470, 485-86 (1992). Although a defendant's rehabilitative potential must be considered, that factor " 'is not entitled to greater weight than the seriousness of the offense.' " *People v. Alexander*, 239 Ill. 2d 205, 214 (2010) (quoting *People v. Coleman*, 166 Ill. 2d 247, 261 (1995)). Moreover, because a trial court need not explicitly analyze each relevant factor or articulate the basis for the sentence imposed, when mitigating evidence is presented before the trial court, it is presumed that the court considered that evidence in imposing the defendant's sentence. *People v. Averett*, 381 Ill. App. 3d 1001, 1021 (2008); *People v. Ramos*, 353 Ill. App. 3d 133, 137 (2004). Ultimately, because the trial court is in the best position to weigh these factors, the sentence that the trial court imposes is entitled to great deference and will not be reversed absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000); *People v. Lee*, 379 Ill. App. 3d 533, 539 (2008). Indeed, a reviewing court will not reweigh the factors in reviewing a defendant's sentence and may not substitute its judgment for the trial court merely because it could or would have weighed the

factors differently. *People v. Jones*, 376 Ill. App. 3d 372, 394 (2007). Moreover when a sentence falls within the statutory guidelines, it is presumed to be proper and will not be disturbed absent an affirmative showing that the sentence is at variance with the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense. *People v. Gutierrez*, 402 Ill. App. 3d 866, 900 (2010); *Ramos*, 353 Ill. App. 3d at 137.

¶ 47    Keeping these principles in mind, we turn to address the merit of defendant's claim. Initially, we note that based on the statutory sentencing guidelines in effect when defendant committed the crime, he was subject to a term of imprisonment that was "not less than 20 years and not more than 60 years." 730 ILCS 5/5-8-1(a)(1)(a) (West 1998). Accordingly, the 45-year sentence imposed by the circuit falls within the permissible statutory range and is thus presumed proper. *Gutierrez*, 402 Ill. App. 3d at 900; *Ramos*, 353 Ill. App. 3d at 137. We are unpersuaded by defendant's argument that the trial court's sentence was excessive given the mitigating factors. At defendant's sentencing hearing, defendant's mother submitted a letter on her son's behalf. In her letter, she asserted that her son was a good person and a good father. She acknowledged that her son had had previous problems with the law, but emphasized that defendant had earned his GED and was gainfully employed at the time of the shooting. In addition, defendant was permitted to address the court in allocution. In his statement to the court, defendant took responsibility for his actions but maintained that he had not sought out Rodney Clifton at Vanity and had not gone there with the intent to kill him. He also asserted that he was a different person than he was 11 years earlier when the shooting took place.

The record reveals that the court carefully considered relevant aggravating and mitigating factors prior to imposing defendant's sentence. The court acknowledged "the nice letter" written by defendant's mother. However, the court noted that defendant was "not exactly a novice in the criminal justice system" and that he "had time to leave it alone" and depart Vanity before he chose to shoot Clifton eight times when the man was sitting in his car. In discussing the circumstances of the crime, the court noted that the jury had expressly rejected defendant's claim of self-defense and found that the jury's finding was supported by the evidence. The court further found that defendant acted with "callous[ ] indifferen[ce]" when he shot Clifton in front of Clifton's girlfriend Misty, who was trying to diffuse the situation and offered her an empty apology afterwards. Based on the circumstances of the crime, the court found that a 45-year prison term was appropriate. Ultimately, after reviewing the record, we conclude that defendant failed to establish that the trial court abused its discretion and imposed an excessive sentence. Accordingly, defendant's 45-year sentence is affirmed.

¶ 48                                                    CONCLUSION

¶ 49    For the reasons set forth above, the judgment of the circuit court is affirmed.

¶ 50    Affirmed.