2020 IL App (1st) 162299-U

FIRST DISTRICT
SECOND DIVISION
June 30, 2020

No. 1-16-2299

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 13 CR 19206 |
| | ) | |
| MICHAEL JOHNSON, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not abuse its discretion in limiting the cross-examination of a detective regarding evidence found at defendant's home following a thorough and systematic search. The facts of this case do not support remand for a resentencing hearing.

¶ 2    Following a jury trial, defendant Michael Johnson was convicted of the first degree murder of 16-year old Maurice Knowles and attempted first degree murder of Christian Slaughter. The trial court sentenced defendant to 55 years' imprisonment on the first degree murder conviction and 25 years' imprisonment on the attempted murder conviction to be served consecutively. On appeal, defendant argues that his convictions must be reversed because the trial court abused its

discretion in prohibiting testimony on cross-examination that no handgun was recovered during a search of defendant's house. Defendant also argues that he is entitled to a new sentencing hearing because the trial court improperly considered his void 2012 aggravated unlawful use of a weapon (AUUW) conviction as an aggravating factor and failed to sufficiently consider in mitigation his rehabilitative potential and bipolar diagnosis. For the reasons that follow, we affirm defendant's first degree murder and attempted murder convictions and the imposed sentences. Because defendant's prior conviction for AUUW was void *ab initio* under *People v. Aguilar*, 2013 IL 112116, ¶ 22, we vacate that conviction.

¶ 3                                    BACKGROUND

¶ 4        Defendant's convictions stem from a shooting that occurred over Labor Day weekend on September 2, 2013, killing Knowles and injuring Slaughter.[1] Following a search of defendant's house, the police recovered a shotgun inside the house and an extended firearm magazine under the rear porch.[2] The defense filed a motion *in limine* to bar use of the shotgun and extended magazine, arguing those items had no relevancy to the shooting, which involved a handgun, not a shotgun, and there was no eyewitness testimony that the shooter used an extended magazine. The State had no objection as to the shotgun, but argued that the extended magazine was relevant because 9-millimeter shell casings were recovered at the scene and an extended magazine may be used with a 9-millimeter gun. The trial court "agreed with defense here in that it's a bit of a tenuous connection, if any" and granted the motion *in limine*.

¶ 5        The defense also moved to prohibit use of defendant's 2012 AUUW conviction to impeach his credibility, arguing that conviction was void *ab initio* under *Aguilar*, 2013 IL 112116, ¶ 22. The

---

[1]Defendant and co-defendant Ray Coleman were tried together with separate juries.
[2]Defendant also moved to exclude a black hoodie, but that evidence is not relevant to the issues raised on appeal.

State agreed with the defense. The trial court granted defendant's motion *in limine*, citing *Aguilar*. The following testimony was elicited during defendant's jury trial.

¶ 6        Edna Knowles[3] testified that she was Knowles' great aunt and foster mother, and raised him since he was three days old. Edna lived at 10551 South LaSalle Street in Chicago with Knowles, Slaughter, Lisa Johnson[4] (Slaughter's girlfriend), and Slaughter and Lisa's children.

¶ 7        On September 2, 2013, Edna, Knowles, Slaughter, and others gathered outside her house. Around 5 p.m., Edna went inside and heard "some gunshots," "it was rapid fire." Edna did not see the shooting. After hearing the gunshots, Edna saw Knowles running in the door and she learned that he had been shot. Edna knew defendant because he used to come to her house and have dinner with the family. He had also "stayed all night there before."

¶ 8        Slaughter testified that around 5 p.m. on September 2, 2013, he was on the front porch with Knowles, Lisa, Latisha "Nookie" Thompson, his four-year-old son, Edna, and "like two more people." The group was sitting on the porch "cracking jokes." Between 5 and 5:30 p.m. while still on the porch, Slaughter saw three guys "ducked down coming out the yard" across the street. Slaughter first saw defendant (a former friend), behind him was Ray "Little Ray" Coleman (a guy from the neighborhood), and then "Lamaris" (a former high school classmate). Slaughter saw a gun in defendant's and Little Ray's hands, but could "not see the type of gun that they had." Slaughter saw "them drawing the guns lifting them up from ducking down" and everyone who was gathered on the porch turned to go inside the house. Slaughter heard two different guns "go off" and more than three gunshots.

¶ 9        Once inside the house, Slaughter felt blood on his lower back, and Nookie told him that he "got grazed by the bullet, but was not hit." Slaughter was worried about Knowles, "because he

---

[3]We refer to Edna Knowles by her first name because she has the same last name as the victim.
[4]We refer to Lisa Johnson by her first name because she has the same last name as defendant.

kept on saying he was hit." Knowles was inside the house, lying flat on his stomach. Slaughter saw "a hole in [Knowles'] lower back."

¶ 10    The police and an ambulance arrived at the scene. Slaughter refused medical treatment "[b]ecause I was focused on, I wasn't shot you know since I was grazed to the back, I was just focused on Maurice." After more police officers arrived, Slaughter spoke to the officers and named defendant as the shooter.

¶ 11    On September 2, 2013, Lisa testified that she was sitting in her van with her three children, which was parked on the same side of the street as Edna's house and she could see the house from the van. Her four-year old son was on the porch with Slaughter and the others. At around 5:30 p.m., Lisa heard gunshots coming from the house directly across the street from Edna's house. Lisa looked in that direction and saw "three dudes," recognizing defendant as one of them. Lisa saw defendant shoot a black gun towards Edna's porch and heard "like seven gunshots." After the police arrived, she "gave them defendant's name."

¶ 12    Andrea Price testified that on September 2, 2013, at around 5- 5:30 p.m., she was barbequing on her back porch when she heard two gunshots and then "more rapid shots." Price did not see the shooting. She could see 106th Place and LaSalle Street from her porch and saw three men running up the alley about two or three minutes after the shooting. Price first saw defendant, then Ray Coleman, and then Lamaris Oliver. She knew all three men.

¶ 13    After she saw the men running, Price left her porch "to be nosy to see what happened." She walked towards 106th Place and LaSalle Street, which was in the direction of the gunshots that she heard. Price walked to Edna's house because a crowd had gathered there, and she heard people "crying and screaming and yelling." Price knew Knowles because her children had gone to school with him. Price then left, making "a conscious choice not to tell the police what she had seen" because she was "afraid for [her] children's [lives] dealing with a situation like that because [she

had] been threatened before." Price later felt bothered about not talking to the police. The next day, she went to the police station and told detectives what she saw.

¶ 14    Chicago Police Officer Mohammad[5] testified that he responded to a "person shot call" on September 2, 2013, at 10551 South LaSalle Street. He spoke with Slaughter, who identified defendant as the shooter. Less than 10 minutes after arriving at the scene, Officer Mohammad relocated to defendant's house at 352 West 106th Place.

¶ 15    Defendant's father, Willie Johnson, answered the door and let Officer Mohammad inside. While they stood in the living room, Officer Mohammad "observed feet coming from the ceiling of the living room." Officer Mohammed saw "drywall coming down and debris from the ceiling, and [saw] *** two feet coming through the drywall where somebody above [him was] trying to run to the back." For safety reasons, he and Willie[6] left the house. Officer Mohammed believed defendant was in the house, so he called for assistance.

¶ 16    Chicago Police Lieutenant Michael Casey testified that he arrived at 352 West 106th Place and helped set up a perimeter around the house. Willie was on his cellphone talking to defendant and handed the cellphone to Lieutenant Casey. He had a conversation with defendant, who stated: "that he didn't have anything to do with a shooting, and then he was asking [him] who would be in his lineup, who would be the fillers [ ] with him in his lineup." Lieutenant Casey did not tell defendant anything about a shooting or a lineup before he made those comments. After the conversation, defendant voluntarily surrendered and was arrested.

¶ 17    Chicago Police Detective Nathan Poole testified that the day after the shooting, he went to defendant's house to search for physical evidence. On cross-examination, the State objected to the

---

[5]No first name was given for Officer Mohammad.

[6]We refer to Willie Johnson by his first name because he has the same last name as defendant.

following question: "When you went back the next day and did that thorough systematic search, you didn't find any handguns?" During a sidebar, the State argued that the motion *in limine* barred use of the shotgun and extended magazine recovered at defendant's house and defense counsel's question was "getting too close to violating the whole motion *in limine*." The trial court agreed, sustaining the objection and directing the defense to rephrase the question. Detective Poole testified that he located a bag of clothes on the back porch following his thorough and systematic search of the house.

¶ 18        Chicago Police Officer Joseph Scumaci worked as an evidence technician and recovered a bullet that was lodged in the porch at Edna's house. He also recovered three shell casings from the grass in the front yard across the street from Edna's house. The shell casings were discharged from a 9-millimeter gun. Officer Scumaci returned to the police station and administered a gunshot residue test on defendant's hands.

¶ 19        Ellen Chapman of the microscopy trace evidence unit at the Illinois State Police Forensic Science Center tested defendant's gunshot residue kit, which did not test positive for gunshot residue. Chapman explained that washing or wiping one's hands is very effective at removing gunshot residue.

¶ 20        Cassandra Richards of the latent print section of the Illinois State Police Forensic Science Center testified that there were no suitable latent prints on the three shell casings recovered at the scene.

¶ 21        Illinois State Police Forensic Scientist Tracy Konior examined the three shell casings recovered at the scene and determined that all three were fired from the same gun. Konior did not have a gun to test.

¶ 22        The jury found defendant guilty of the first degree murder of Knowles and attempted first degree murder of Slaughter. Following a sentencing hearing, the trial court sentenced defendant to

a term of 55 years' imprisonment on the first degree murder conviction consecutive to a term of 25 years' imprisonment on the attempted murder conviction.

¶ 23                                                    ANALYSIS

¶ 24        Defendant first argues that the trial court abused its discretion when it prohibited defense counsel from asking Detective Poole whether any handguns were found following a search of defendant's house. Defendant claims that this limitation on cross-examination prevented the development of an effective reasonable doubt defense. Defendant, though, concedes that his constitutional right to cross-examination was not infringed.

¶ 25        A defendant has a sixth amendment right to confront the witnesses against him, which includes the right to cross-examine witnesses. U.S. Const., amend VI; Ill. Const. 1970, art. I, § 8; *People v. Sanders*, 2019 IL App (1st) 160718, ¶ 22; *People v. Whitfield*, 2014 IL App (1st) 123135, ¶ 25. Where a defendant's constitutional confrontation rights have been satisfied, the trial court may exercise its discretion and limit the scope of cross-examination. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 100. We will reverse a trial court's restriction on the scope of cross-examination where there has been a clear abuse of discretion that results in manifest prejudice to the defendant. *People v. Jackson*, 2017 IL App (1st) 151779, ¶ 22. A trial court abuses its discretion only when no reasonable person would take the view adopted by the trial court. *Peach v. McGovern*, 2019 IL 123156, ¶ 25.

¶ 26        Here, the trial court acted within its discretion in limiting the cross-examination of Detective Poole on the subject of firearms recovered at defendant's house. The question at issue is: "When you went back the next day and did that thorough systematic search, you didn't find any handguns?" Defense counsel's question risked opening the door to evidence of any firearm recovered from the "thorough systematic search," including the shotgun and extended magazine that had been previously barred and deemed prejudicial.

¶ 27    Nevertheless, the jury was well informed about the lack of a handgun. Specifically, the jury heard testimony from a forensic scientist that she did not have a gun to test, which was in addition to hearing testimony that defendant's hands did not test positive for gunshot residue and defendant's fingerprints were not on the shell casings recovered at the scene. Moreover, defense counsel reiterated during closing that there was no physical evidence tying defendant to the shooting, stating that "[t]here is no firearm at all that is found." Thus, the trial court reasonably restricted the scope of the cross-examination of Detective Poole about the recovery of any handgun and that ruling did not hinder the defense's ability to develop an effective reasonable doubt defense based on the lack of physical evidence corroborating the eyewitness identification of defendant as the shooter. See *People v. Klepper*, 234 Ill. 2d 337, 356-57 (2009) (no abuse of discretion in limiting cross-examination of a witness where the information sought to be elicited was well noted in the record); *People v. Arze*, 2016 IL App (1st) 131959, ¶ 114 (same).

¶ 28    Defendant next claims that his 2012 conviction for AUUW should be vacated because our supreme court in *Aguilar*, 2013 IL 112116, ¶ 22, declared the statute he was convicted under (720 ILCS 5/24-1.6(a)(2)/(3)(A) (West 2012)) facially unconstitutional. *People v. Mosley*, 2015 IL 115872, ¶ 25. The State concedes, and we agree, that defendant's prior AUUW conviction is void *ab initio*. See *In re N.G.*, 2018 IL 121939, ¶ 36 (conduct under a statute found to be facially unconstitutional "was not, is not, and could never be a crime" and "the conviction must be treated by the courts as if it did not exist"). Thus, we vacate defendant's void 2012 AUUW conviction (12 CR 1376901). *People v. Bridges*, 2020 IL App (1st) 170129, ¶ 36; see *In re N.G.*, 2018 IL 121939, ¶ 43 (void judgments may be "impeached at any time in any proceeding").

¶ 29    Defendant also claims that he is entitled to a new sentencing hearing because the trial court improperly considered his void 2012 AUUW conviction in aggravation.

¶ 30　　　　Defendant acknowledges that he has forfeited our review of this claim, but urges review under the plain error doctrine. *People v. Harvey*, 2018 IL 122325, ¶ 15. The plain-error doctrine is "a narrow and limited exception to the general waiver rule." *People v. Pastorino*, 91 Ill. 2d 178, 188 (1982). The first step in a plain error analysis requires the defendant to establish that a clear or obvious error occurred. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.* Under both prongs, the defendant bears the burden of persuasion, and the failure to meet that burden results in the procedural default being honored. *Id.*

¶ 31　　　　The State recognizes that the trial court "erred by acknowledging defendant's conviction at the sentencing hearing," but argues that the prior conviction had no impact on defendant's sentence.

¶ 32　　　　Here, defendant failed to meet his burden of persuasion under either prong of the plain error doctrine. The trial court granted defendant's pretrial motion *in limine*, finding "the gun case is void *ab initio* under *People versus Aguilar*." Thus, the record is clear that the trial court knew that defendant's prior AUUW conviction was void. *People v. Golden*, 229 Ill. 2d 277, 284 (2008) (we must presume that a trial judge knows and follows the law).

¶ 33　　　　Although the trial court knew defendant's prior AUUW conviction was void, the trial court erred in alluding to that conviction when discussing the factors in aggravation, stating that "although it is low level, but there is criminal history that involves a gun, which is, unfortunately, very telling in that he caused the death of Maurice Knowles by using a gun." See *People v. Billups*, 2016 IL App (1st) 134006, ¶ 15 (a trial court may not consider in aggravation a prior conviction based on an unconstitutional statute). However, in fashioning defendant's sentence, the trial court properly considered the factors in aggravation and mitigation, the presentence investigation report

(PSI), the victim impact statement, the testimony and letters offered in support by the defense, and the material presented before the court in its entirety. The trial court stated that defendant "committed an awful offense. It is an absolute tragedy. I am sentencing you to a very long sentence in the penitentiary." The trial court recognized the need for "a sentence that is commiserate with the crimes that Mr. Johnson committed here and necessary to protect the citizens of Cook County and to deter others from following in Mr. Johnson's footsteps." See *People v. Bridges*, 2020 IL App (1st) 170129, ¶ 39 (the trial court's detailed and clear explanation of its sentence indicated that defendant's void AUUW conviction had no effect on the sentence).

¶ 34 The trial court's telling remarks during the sentencing hearing reveal that the trial court placed little to no weight on defendant's prior AUUW conviction in sentencing defendant, but imposed a sentence reflecting the "awful" nature of the crimes committed. Indeed, the trial court did not refer to defendant's void AUUW conviction when it explained the basis for defendant's sentence. See *contra People v. Smith*, 2016 IL App (2d) 130997, ¶ 9 (the trial court determined that the defendant's "prior record alone coupled with the facts of this case certainly require a sentence far in excess of the minimum"). In this case, defendant failed to demonstrate "that the error was so egregious as to deny [him] a fair sentencing hearing." *People v. Ware,* 2014 IL App (1st) 120485, ¶ 36; see *People v. Beals*, 162 Ill. 2d 497, 510 (1994) (resentencing not required where the record established that the trial court placed insignificant weight on the improperly considered aggravating factor); *People v. Whitney*, 297 Ill. App. 3d 965, 969 (1998) (sentence may be affirmed where the weight placed on "an improperly considered aggravating factor was so insignificant it resulted in no increase in the defendant's sentence").

¶ 35 Likewise, the evidence at the sentencing hearing was not closely balanced, particularly given that the trial court did not find that any of the statutory mitigating factors applied. The trial court did not err in finding that the factors in aggravation and the nature of the crimes committed

outweighed any factors and considerations in mitigation. Therefore, resentencing is not warranted because defendant failed to establish plain error.

¶ 36    Defendant finally argues that his sentence is excessive because the trial court failed to fully consider his rehabilitative potential and bipolar disorder.

¶ 37    A sentence imposed by the trial court that falls within the statutory range is presumed proper and is reviewed for an abuse of discretion, which occurs "where the sentence is at variance with the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense." *People v. Alexander,* 239 Ill. 2d 205, 212 (2010); *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. In imposing a sentence, the trial court must balance the relevant factors, including the nature of the offense, the protection of the public, and the defendant's rehabilitative potential. *Alexander*, 239 Ill. 2d at 213. The trial court is presumed to have considered all mitigating evidence, absent some affirmative indication to the contrary and despite the length of the sentence imposed. *People v. Salazar-Corona*, 2020 IL App (1st) 172496, ¶ 32.

¶ 38    In this case, defendant's first-degree murder conviction was subject to a sentencing range of 20 to 60 years' imprisonment (720 ILCS 5/9(a)(1) (West 2012)) consecutive to a sentence in the range of 6 to 30 years' imprisonment for attempted first degree murder (720 ILCS 5/8-4(c) (West 2012)). The trial court imposed a sentence of 55 years for defendant's first-degree murder conviction and 25 years for the attempted first-degree murder conviction to be served consecutively (730 ILCS 5/5-8-4(d)(1) (West 2012)), which fell within the permissible statutory guidelines. Thus, defendant's sentence is presumed proper and will be reversed only if found to be an abuse of discretion. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995); *People v. Knox*, 2014 IL App (1st) 120349, ¶ 45.

¶ 39    We find that the trial court acted within its discretion in imposing defendant's sentence. Evidence of defendant's bipolar diagnosis was detailed in the PSI and discussed during the

sentencing hearing, including his prior hospitalization for "psychological situations." See *People v. Thompson*, 222 Ill. 2d 1, 42-43 (2010) (defendant's mental or psychological impairment may not be inherently mitigating and may not be enough to overcome factors in aggravation). Nothing in the record establishes that the trial court ignored defendant's bipolar diagnosis, especially considering that the trial court referred to the bipolar diagnosis at the start of the sentencing hearing.

¶ 40    Defendant also argues that his sentence is excessive because the trial court failed to sufficiently consider his rehabilitative potential, based on his youth (23-years old at the time of the offense),[7] education, and background. But the trial court recognized that defendant had strong family support, a two-year college education, and was a talented drummer. The trial court noted "[t]here is rehabilitative potential here, which makes what happened all the more tragic." The trial court found that defendant "committed an awful offense. It is an absolute tragedy." Defendant's conduct consisted of shooting at a group of unsuspecting individuals enjoying themselves outside their home, killing a 16-year old boy and injuring another individual as they turned away from the gunfire to go inside their home. The trial court was entitled to exercise its discretion and find that the nature and seriousness of the offense outweighed the considerations in mitigation and the goal of rehabilitation. *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 34.; *People v. Sims*, 403 Ill. App. 3d 9, 24 (2010). In essence, defendant is requesting this court to reweigh the sentencing factors and substitute our judgment for that of the trial court, which we cannot do. *Alexander,* 239 Ill. 2d at 213; *People v. Brown*, 2018 IL App (1st) 160924, ¶ 8. The trial court was in the best position to evaluate the facts of this case and did not abuse its discretion in fashioning a sentence that fell

_____

[7]The trial court was not required to consider the sentencing factors applicable to juveniles or treat his age as a mitigating factor because defendant was an adult when he committed the offenses. *People v. Charleston*, 2108 IL App (1st) 161323, ¶ 23.

within the permissible statutory guidelines. *People v. Snyder,* 2011 IL 111382, ¶ 37; see *People v. Parker*, 288 Ill. App. 3d 417, 423 (1997) ("A lengthy sentence does not mean mitigating factors were ignored.").

¶ 41                                       CONCLUSION

¶ 42        Defendant's first-degree murder and attempted first-degree murder convictions and sentences are affirmed. We vacate defendant's void 2012 AUUW conviction in case number 12 CR 1376901.

¶ 43            13 CR 1920601 affirmed; 12 CR 1376901 vacated.