2020 IL App (1st) 171641-U

No. 1-17-1641

Order filed May 22, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 547 |
| | ) | |
| ANTHONY HINES, | ) | Honorable |
| | ) | Dennis John Porter, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE DELORT delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirm defendant's sentence of two concurrent nine-year terms for two counts of aggravated robbery, over his contention that the sentence is excessive because the trial court failed to consider mitigating factors.

¶ 2     Following a bench trial, defendant Anthony Hines was convicted of two counts of aggravated robbery (720 ILCS 5/18-1 (West 2016)) and sentenced to concurrent terms of nine years' imprisonment. On appeal, defendant contends that his sentence is excessive. We affirm.

¶ 3    Defendant was charged by information with two counts of aggravated robbery, and two counts of unlawful restraint. He waived his right to a jury trial, and the case proceeded to a bench trial.

¶ 4    Sean Mulheron testified that on December 21, 2015, as he was working at a Walgreens store on the 4700 South block of Halsted Street in Chicago, he saw a man crouched down in one of the aisles after the store had closed. The man was holding a gun and ran towards Mulheron, who ran to the back office of the store. The man followed Mulheron into the office where Rayshonda Pierce was collecting money from the "drawers" at the end of the shift. The man pointed the gun at Mulheron's head and told Mulheron to "give him the money." Mulheron took the money from the drawers and placed it in a bag that the man gave him. The man hit Mulheron with his arm and hit Pierce, and repeatedly told Pierce to open the safe, but she was not able to do so. The man then left the store. In court, Mulheron identified a video, showing the man wearing a mask, and hitting him and Pierce multiple times on the head. He also identified the hooded jacket the man wore and photos of his coworkers, and himself, the Walgreens store, and other items seen on the night of December 21. On cross-examination, Mulheron stated the man was wearing one glove.

¶ 5    Pierce testified that on December 21, 2015, she was shift manager at Walgreens. Pierce was working with Mulheron, Sharita Harrison, and Sonia Maya. Pierce removed the drawers of money from the registers and went to the back office with the money. After hearing a scream, Pierce looked through the office window and saw Mulheron with a man wearing glasses, a white mask covering his nose and mouth, and a hoodie. The man should not have been in the store because the store had closed. Mulheron and the man approached the office door and the man pushed his way into the office with Mulheron. The man pointed a black and silver gun at Pierce

and Mulheron, and he had Mulheron empty the money from the drawers into a bag he brought. The man wanted Pierce to open the safe as well, but she was not able to do so. The man struck her with his gun and, after emptying out all the money, the man and Pierce left the office. The man grabbed Maya and forced her to let him out of the store. Pierce followed behind him and unlocked the door enabling him to leave. After seeing the man leave the Walgreens parking lot, Pierce locked the door and called 9-1-1. The man took Pierce's "Walgreens badge" after asking if she had identification. Pierce identified photos, videos of the incident, and explained defendant's flight from the store using a map of the neighborhood. The video showed that she was hit several times.

¶ 6      Maya testified that on December 21, 2015, she worked one of the registers at the Walgreens store. At closing time, Pierce took the drawer from each register. She took the drawer from Maya's register last and brought the drawers to the office. Maya then heard Pierce yell, and she went towards the noise. As she did so, she saw a man holding a gun and wearing a dust mask and checkered hoodie run towards her. The man demanded that Maya open the door to the store. Maya "froze" because she did not want to open the door. The man pointed the gun at her and dragged her towards the door. Pierce came from behind, asked the man not to hurt Maya and opened the door. In court, Maya identified photos of the store, videos of the incident, and the hoodie the man was wearing on the night of the robbery.

¶ 7      Chicago police officer Kent Elmer testified that he and his partner Mark Evans responded to a flash message of a robbery in progress "in the direction of 4700 South Halsted" Street. Elmer observed defendant about a quarter of a block away from a Walgreens on the 4700 South block of Halsted Street. Elmer identified defendant in court. After seeing defendant, Elmer asked him if he resided at that address and after defendant said no, Elmer and Evans exited their vehicle. As they

did, defendant fled. The officers pursued and eventually apprehended him. Elmer was then directed by Officer Kerry to the backyard of 722 West 47th Place, which was less than half a block from where Elmer initially saw defendant.[1] There, Elmer saw a bundle of clothing that contained a hoodie, a glove, a surgical mask, and a bag. Elmer also saw the barrel of a handgun protruding from the bundle. He identified photos of these items in court and used a map during testimony to explain where events occurred.

¶ 8    Chicago police evidence technician Hermogenes Del Toro testified that on December 21, 2015, he was assigned to gather evidence at the Walgreens. He took pictures of the scene and then was directed to the backyard of 722 West 47th Place where he recovered a "replica" silver and black gun, a hat, a hooded sweatshirt, a bag full of money, a dust mask and a glove.

¶ 9    Illinois State Police forensic scientist Ronald Tomek testified that he collected DNA from the glove, and a dust mask that were obtained during the investigation of the case. Illinois State Police forensic scientist Jennifer Belna testified that she received DNA swabs from a glove and a dust mask, and a buccal swab from defendant. The glove had a mixture of at least four DNA profiles and of them "a partial major male DNA profile" from which defendant could not be excluded. She explained that approximately 1 in 6.5 trillion black, 1 in 53 trillion white or 1 in 25 trillion Hispanic individuals would have this same profile. Belna also obtained a DNA profile from the mask that was a complete match of the DNA profile of defendant. She explained that approximately 1 in 180 decillion black, 1 in 2.7 duodecillion white or 1 in 290 undecillion Hispanic individuals would have this same profile. The State introduced into evidence the photos, videos of

---

[1] The first name of Officer Kerry is not in the record.

the incident, the hoodie Mulheron and Maya identified in court, a black hat, and maps of the neighborhood. The State then rested.

¶ 10    Defendant testified that on the night of December 21, 2015, he was leaving a friend's home at 724 or 726 West 47th Place. He met his friend on "an escort service-type of on-line thing where you pay for company by, like an hour, 30-minute thing." As defendant left his friend's house, he stopped to light a cigarette and, from his peripheral vision, he saw someone holding a gun and approaching him. After he turned around, he was tackled to the ground, hit in the back of the head, and asked to place his hands behind his back. He was then handcuffed, and realized it was the police. He was placed in the back of a vehicle and transported to the Walgreens parking lot where he stood in front of a window of Walgreens and was observed by a "group of people." After being brought to the police station, he was examined by a doctor, who stated he had "a fractured scaphoid bone" and would require surgery on his left wrist. Defendant stated he had never been in the Walgreens on 47th Place and Halsted Street, although the bus he took to the area that night stopped within sight of the Walgreens. On cross-examination, he identified the person he met as "Juicy" and stated he never fled from police and no one identified themselves as Chicago police officers to him.

¶ 11    In rebuttal, the State presented certified copies of defendant's convictions for robbery in 09 CR 3334, and for possession of a controlled substance in 12 CR 430. The parties also stipulated that, if the State was to call Chicago police officer Todd Ptaszkowski to testify, he would state that defendant "refused to go to the hospital, even after the Chicago Fire Department arrived on scene to assist him."

¶ 12    The court found defendant guilty of all four counts. The court merged count three of unlawful restraint of Mulheron into count one of aggravated robbery of Mulheron, and count four of unlawful restraint of Pierce into count two of aggravated robbery of Pierce. Defendant filed a motion for a new trial that the circuit court denied.

¶ 13    At the sentencing hearing, the court reviewed a presentence investigation report (PSI) which reflected that defendant's criminal history consisted of a conviction for possession of a controlled substance in 2012 for which he received two years' probation, and a conviction for robbery in 2010 for which he received boot camp. Defendant obtained a GED certificate and a dental assistant certificate from Everest College. He was employed as a dental assistant prior to his incarceration. The PSI also shows that defendant was fired from one job because of his criminal background and let go from another because of an employee dispute.

¶ 14    The court then heard arguments in aggravation and mitigation. In aggravation, the State emphasized the premeditated nature of the crime as highlighted by defendant's actions. The State pointed out that defendant waited until after the store closed and brought with him a mask and a gun. The State highlighted the violent nature of the robbery during which defendant "slap[ped]" the victims, the severe threat of harm posed by defendant and his criminal history, including a conviction for robbery for which he received boot camp.

¶ 15    In mitigation, defense counsel highlighted the lack of injury to anyone involved in the incident, the presence of defendant's mother and cousin at the sentencing hearing, and the three letters of reference for defendant that detailed his active involvement in his church, and his character. Defendant made a statement in allocution, apologizing for his actions, and stating he

was an active church member and part of a mentorship program. He explained that he had lost several jobs because of his "background."

¶ 16    In announcing sentence, the court noted defendant's prior criminal history as listed in the PSI, and pointed out that the prior robbery conviction was "the most disturbing thing about [his] behavior." The court also noted the stress caused by "the way that the crime was carried out." The court continued:

"In mitigation, the defendant has a work record which is something that a lot of people who appear before the Court do not have. He has people who are willing to put up a shoulder for him. He has no drug involvement. And defendant has expressed an apology which I believe to be sincere."

The court also stated it "considered the factors in aggravation and mitigation, the character and background of the defendant, the facts of the case, the PSI, arguments of counsel and the statement of defendant." The court found that the factors in mitigation did "not take away the fact of [defendant's] bad record and [defendant's] prior robbery." The court sentenced defendant to concurrent terms of nine years in prison for both counts of aggravated robbery. Defendant filed a motion to reconsider sentence, arguing that the court did not properly consider the mitigating factors. The court denied the motion.

¶ 17    On appeal, defendant argues that his sentence is excessive. He contends that the court abused its discretion in imposing sentence by not giving proper weight to the mitigating factors presented at sentencing.

¶ 18    The Illinois Constitution requires that a trial court impose a sentence that reflects both the seriousness of the offense and the objective of restoring the defendant to useful citizenship. Ill.

Const. 1970, art. I, § 11; *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 27. In reaching this balance, a trial court must consider several aggravating and mitigating factors, including the "defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). Although the trial court's consideration of mitigating factors is required, it has no obligation to recite each factor and the weight it is given. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. Absent some indication to the contrary, other than the sentence itself, we presume the trial court properly considered all relevant mitigating factors presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19.

¶ 19    In reviewing a defendant's sentence, this court will not reweigh the factors and substitute its judgment for that of the trial court merely because it would have weighed the factors differently. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20. The trial court is in the superior position to weigh the appropriate factors and so its sentencing decision is entitled to great deference. *Id.* Where that sentence falls within the statutory range, it is presumed proper and will not be disturbed on review absent an abuse of discretion. *Alexander*, 239 Ill. 2d at 212-13. An abuse of discretion exists where the sentence imposed is "greatly at variance with the spirit and purpose of the law, or is manifestly disproportionate to the nature of the offense." *Alexander*, 239 Ill. 2d at 212 (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)).

¶ 20    Here, we find that the circuit court did not abuse its discretion in sentencing defendant to concurrent terms of nine years' imprisonment on two counts of aggravated robbery. In this case, defendant was convicted of aggravated robbery, a Class 1 offense with a sentencing range of 4 to 15 years in the Illinois Department of Corrections. 720 ILCS 5/18-1(c) (West 2016); 730 ILCS 5/5-4.5-30(a) (West 2016). The court sentenced defendant to concurrent terms of nine years'

imprisonment. Because his sentence is in the permissible sentencing range, we presume it is proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 21    Defendant does not argue that his nine-year sentence was outside of the sentencing range. Rather, he argues that there was an abuse of discretion because the sentence did not reflect consideration of his background, his education and work history, the facts of the case including that he used a "fake" gun, his strong family ties, his sincere remorse, and his rehabilitative potential. Defendant does not contend that the court ignored these mitigating factors. Instead, he essentially asks this court to reweigh the factors presented to the circuit court and come to a different conclusion.

¶ 22    However, as mentioned, absent some indication to the contrary other than the sentence itself, we presume the circuit court properly considered all relevant mitigating factors presented. *Sauseda*, 2016 IL App (1st) 140134, ¶ 19. The trial court is not required to recite each mitigating factor and the weight it is given. *Wilson*, 2016 IL App (1st) 141063, ¶ 11. Moreover, "a reviewing court must not substitute its judgment for that of a sentencing court merely because it would have weighed the factors differently." *People v. Streit*, 142 Ill. 2d 13, 19 (1991).

¶ 23    As such, to prevail on these arguments, defendant "must make an affirmative showing [that] the sentencing court did not consider the relevant factors." *People v. Burton*, 2015 IL App (1st) 131600, ¶ 38. Defendant has not made such a showing here, and his reliance on the sentence itself as affirmative evidence is not sufficient. See *Sauseda*, 2016 IL App (1st) 140134, ¶ 19 ("[I]t is presumed, absent some indication to the contrary, other than the sentence itself, that the court considered" mitigating evidence presented).

¶ 24     At the sentencing hearing, the cicuit court considered the factors in aggravation and mitigation. The court presided over defendant's trial and heard evidence concerning the nature of the offenses, including the fact that defendant used a replica a gun during the crime. In addition, details of the case, defendant's criminal history, and educational and work history are contained in defendant's PSI. In announcing sentence, the court expressly listed factors in aggravation and mitigation, including defendant's prior criminal history, the stress caused by "the way that the crime was carried out," defendant's work record, support structure, lack of drug involvement, and sincere apology. See *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 13 (" 'criminal history alone' may 'warrant a sentence substantially above the minimum' " where the "defendant was not deterred by previous, more lenient sentences") (quoting *People v. Evangelista*, 393 Ill. App. 3d 395, 399 (2009)); *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 32 ("The seriousness of the offense is one of the most important factors for the court to consider"); *Alexander*, 239 Ill. 2d at 214 (rehabilitative potential is not given greater weight than the seriousness of the offense). Considering the circuit court is presumed to consider all the factors presented in mitigation, and the record does not contradict this, we find that the circuit court did not abuse its discretion in sentencing defendant to concurrent terms of nine years' imprisonment.

¶ 25     We affirm the judgment of the circuit court of Cook County.

¶ 26     Affirmed.