2020 IL App (1st) 171789-U

No. 1-17-1789

Order filed June 30, 2020

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 19566 |
| | ) | |
| EMILIO IZAGUIRRE, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's consecutive sentences for first degree murder, home invasion, and aggravated battery are affirmed where the trial court did not (1) abuse its discretion imposing sentences within the statutory guidelines, (2) penalize defendant for exercising his right to trial, or (3) consider an improper factor during sentencing.

¶ 2    Following a jury trial, defendant Emilio Izaguirre was convicted of first degree murder, home invasion, and aggravated battery, and sentenced to consecutive terms of 60, 10, and 5 years' imprisonment, respectively. On appeal, defendant argues (1) his sentences are excessive,

(2) the trial court penalized him for exercising his right to trial, and (3) the trial court considered an improper aggravating factor, namely, that he planned the offenses for a time when his children would not be present. For the following reasons, we affirm.

¶ 3     Defendant was charged in a 24-count indictment with first degree murder of Joanna Lopez,[1] home invasion, residential burglary,[2] and aggravated battery causing great bodily harm to Johnny Bolden. Counts VI and IX for first degree murder stated that defendant, without lawful justification, stabbed and killed Joanna with a knife (720 ILCS 5/9-1(a)(1), (2) (West 2012)). Count XVI for home invasion, in turn, alleged that defendant committed that offense in the course of the murder (720 ILCS 5/19-6(a)(2) (West 2012)), and count XXIV for aggravated battery alleged that defendant caused Bolden great bodily harm (720 ILCS 5/12-3.05(a)(1) (West 2012)). We set forth only those facts relevant to the issue on appeal.

¶ 4     Before trial, defense counsel requested a conference pursuant to Supreme Court Rule 402 (eff. July 1, 2012), which occurred off the record on December 22, 2016. That day, the court distributed a pretrial investigation report that listed the charges but did not detail any underlying facts alleged by the State. On January 19, 2017, defense counsel informed the court that defendant declined the trial court's offer. At a subsequent hearing on March 2, 2017, the court confirmed with defendant that it had offered 40 years' imprisonment, but did not state the charge or charges to which the offer pertained.

¶ 5     At trial, Bolden testified that he dated Joanna, who had three children with defendant. Bolden and Joanna lived together on the 1700 block of West 21st Place. On September 7, 2013,

---

[1] Because Joanna Lopez and a witness, Jose Lopez, have the same last name, they are referred to by their first names.

[2] The record does not show that the State expressly nol-prossed the counts for residential burglary, but the jury was not instructed as to that offense.

Bolden and Joanna went out for the evening while her children spent the night across the street with her parents. The couple returned to their apartment around 5 a.m. and went to sleep. Bolden was awakened by defendant repeatedly striking him in the face and saying to Joanna, "This is the guy that you're with? My kids wasn't lying to me, huh?" Bolden fought with defendant while Joanna called the police on her cell phone. Bolden then fled the apartment wearing only a tank top and underwear.

¶ 6    Bolden heard Joanna scream as he ran to a laundromat a block away. When the laundromat employees did not let him use their phone, Bolden went to a gas station, where an attendant contacted the police. Police took Bolden back to Joanna's apartment, and Joanna's father provided the key. Police brought defendant, who was covered in blood, out of the apartment, retrieved a knife from his pocket, and put him into a squad vehicle. Bolden went to Mercy Hospital, where he was treated for a sprained shoulder, a fractured bone in his eye, and a swollen nose and lip.

¶ 7    Jon and Esmeralda Zaba[3] both testified that Joanna was a family friend who lived a couple houses down from them. They knew that Joanna had previously dated defendant and that in September 2013, Joanna was dating someone else.

¶ 8    Around 6:45 a.m. on September 8, 2013, Jon and Esmeralda were awakened by noise from outside. They looked out the window and saw a black man wearing only his underwear. The man walked away and Jon heard a woman scream, so Esmeralda called the police. Jon and Esmeralda went outside, and police arrived to Joanna's residence. Defendant opened Joanna's door covered in blood, looked around, then closed the door. Jon took officers to retrieve a key

---

[3] Because Jon Zaba and Esmeralda Zaba have the same last name, they are referred to by their first names.

from Joanna's father. Officers then escorted defendant from the residence, and Jon heard defendant say, "I loved her, but she brought it upon herself because she was f*** a n***." Esmeralda testified that she heard defendant say in both English and Spanish, "Joanna deserved it. It was her fault for f*** a n***." On cross-examination, Jon testified that "every once in a while" he saw defendant pick up his children or play with them in the neighborhood.

¶ 9    Jose, Joanna's father, testified through an interpreter that he owned the apartment building in which Joanna lived. Defendant previously lived in the apartment with Joanna and their three children. At approximately 6:45 a.m. on September 8, 2013, Jose was alerted that police needed keys to enter Joanna's apartment. Jose opened Joanna's door for police and watched them remove defendant, who was "all bloody." On cross-examination, Jose testified that defendant continued to visit the children after he and Joanna separated.

¶ 10    Chicago police officer David Magura testified that around 7 a.m. on September 8, 2013, he responded to a domestic disturbance call on the 1700 block of 21st, where he was met by Officer Spizzirri.[4] Defendant opened the door and said that he did not call the police, but that his roommates had been drinking and fighting. Defendant had blood on his shirt and arm, which he claimed belonged to his roommates. The officers said they needed to enter the apartment, and defendant responded, "fine," but then slammed and locked the door. Another officer arrived and Magura moved around the building to ensure defendant could not leave. Magura heard the other officer yell for defendant to raise his hands, but by the time Magura ran back to the door, defendant had reentered the apartment.

---

[4] Officer Spizzirri's first name does not appear in the record.

¶ 11    At some point, Jose gave the officers a key to the apartment. The officers entered and found defendant in the bedroom kneeling over Joanna's bloody body. The officers arrested defendant, patted him down, and put him in a squad vehicle. During defendant's arrest, he was "yelling out, [and] calling out names," and eventually began "thrashing and kicking at the door and window," so he was transferred to a police wagon.

¶ 12    Retired Chicago police officer Ramon Saragosa testified that he saw defendant kneeling by a female's body in the apartment. Officers recovered a knife blade from defendant's left front pocket. Defendant was "[e]rratic, yelling, somewhat violent, [and] somewhat calm off and on" as he was put into a squad vehicle. Defendant then said, "That's what you get for sleeping with that f*** n***." Because defendant kicked the doors and windows of the squad vehicle, he was moved into a police wagon and transported to Area Central.

¶ 13    Chicago police detective Timothy Cerven testified he went to the crime scene on September 8, 2013. Cerven recovered Joanna's and Bolden's cell phones, and tendered Joanna's phone to Detective Cullen Murphy.

¶ 14    Murphy[5] testified that he was at Area Central when defendant was brought in on September 8, 2013. Defendant's clothing was "extremely soaked in blood" and his hands had "slippage marks." Murphy explained that blood makes a knife handle slippery, so the hand of the person doing the stabbing slips and the blade cuts his own fingers.

¶ 15    Murphy brought Joanna's cell phone to the Regional Computer Forensic Laboratory (RCFL), which accessed incoming and outgoing text messages for September 7 and 8, 2013. In

---

[5] At the time of trial, Murphy was a sergeant.

the late evening of September 7 and morning of September 8, there were multiple text messages between Joanna's phone and a contact name "B.D."

¶ 16    Chicago police detective Scott Reiff testified that on April 25, 2017, he retrieved a phone that had been recovered at the crime scene and inventoried under No. 12998343 and took it to the RCFL to be analyzed.

¶ 17    Chicago police detective John Clisham testified that he was assigned to the RCFL. On April 25, 2017, Clisham received a cell phone inventoried under No. 12998343, which he examined. The phone was associated with an email account containing defendant's first name and last initial, and had the same phone number as the contact name "B.D." seen in Joanna's phone. Clisham also recovered Facebook messages dated August 14, 2013, in which a user stated his phone number, which was the same as the number associated with "B.D.," and a chat session in which defendant's name was listed next to the word "owner."

¶ 18    On that same date, there was a text message from Joanna's phone number, which stated, "Emilio, I don't want to be with you." There was also a series of text messages between the phone and that contact on September 7 and 8, 2013, which were published to the jury. In the text exchange, the sender asked the contact if she was with "johnny," then, referring to "johnny," asks if he was her "man," if she was "f***" him, and if he was "better" than the sender. The sender also stated he was "hurting so much," "remember [whose] name is on my chest," "I [can't] take this no more," "I can't stop crying," and "I love [you] so much." The contact said she was trying to sleep and asked to be left alone.

¶ 19    Investigator Eric Szwed testified that he arrived at the crime scene around 8:30 a.m. on September 8, 2013, and Saragosa gave him a bloodied knife blade. Szwed then videotaped and

photographed the apartment's interior. Szwed identified a series of photographs that included the victim lying in a "large pool of blood," a broken picture frame and photograph of a man and woman on the floor, a large kitchen knife with its blade under the refrigerator, a "large bloodied kitchen knife" in the sink and a knife handle next to the sink, a kitchen knife block with several knives missing, and a pool of blood in the kitchen with a large knife blade and a small piece of black plastic, which Szwed believed broke off from the handle of one of the knives.

¶ 20    The State called forensic scientists from the Illinois State Police, whose testimony established, in relevant part, that a female DNA profile from which Joanna could not be excluded was indicated on swabs from a knife blade, the dining room floor, the rear bedroom wall, and the rear entry door to a bedroom, and defendant's palm print was on a knife handle.

¶ 21    Dr. Latanja Watkins testified that she conducted an autopsy of Joanna on September 9, 2013. There were fragments of glass located in and around Joanna's arms, abdomen, chest, head, and hair. Joanna suffered approximately 30 stab wounds and incise wounds to her head, face, neck, and chest. She also had blunt force injuries to her head, neck, chest, and extremities, and defensive incise wounds to both of her hands. X-rays revealed orbital fractures around Joanna's eye bones.

¶ 22    The jury found defendant guilty of first degree murder (counts VI and IX), home invasion (count XVI), and aggravated battery (count XXIV). Defense counsel filed a written motion for a new trial, which the trial court denied.

¶ 23    Prior to the sentencing hearing, defense counsel objected to a portion of Joanna's sister's victim impact statement regarding sentencing. The court responded that it would allow the statement, but would not consider any sentencing suggestions therein.

¶ 24    Defendant's presentence investigation report reflects that he was involved with the Latin Kings street gang and had three prior adult convictions for resisting a peace officer, driving under the influence of alcohol, and "Theft/Stolen Operate Uninsured MV." Prior to his arrest, defendant was employed as a line worker at a factory and reported a "very close relationship" with his three children with Joanna. Defendant's father was never in his life, but he maintained a relationship with his mother. Throughout defendant's childhood, his basic needs were met and he was not abused or neglected. Defendant was an average student, but was expelled from his senior year of high school due to absenteeism. Defendant expressed an interest in obtaining his GED.

¶ 25    In aggravation, the State presented a victim impact statement from Bolden, in which he expressed his sense of guilt over failing to protect Joanna from defendant, stated that the murder is the "worst thing" he ever experienced, and that he lost his ability to be optimistic. Bolden stated that his "reason to smile and be happy" was taken from him, and he is "waiting for this life to be over" so that he can be with Joanna again.

¶ 26    The State also presented a victim impact from Joanna's sister, in which she stated that everyone in her family was impacted by the loss of Joanna, but Joanna's children are affected the most, as they will eventually learn what happened to her.

¶ 27    The State then argued that at the time of Joanna's murder, she was 26 years old, the mother of three young children, had siblings and parents, and was dating Bolden. Defendant broke into Joanna's home and beat and stabbed her approximately 30 times using five knives. When police arrived, defendant would not open the door, and tried to clean the evidence. When defendant was arrested, he made racial statements putting the blame on Joanna. The State noted

defendant's three prior misdemeanor convictions and a pending charge for stabbing an inmate, and asked for the maximum sentence.

¶ 28    Defense counsel argued in mitigation that the maximum sentence was inappropriate. Counsel stated that defendant was 33 years old at the time of the offense and "heart broken" by the mother of his children moving on with someone else. Moreover, defendant did not have prior felony convictions. Counsel noted that she could not speak to the pending case, at which point the trial court stated it would not consider it because the State did not present supporting evidence. Counsel continued that defendant was unlikely to commit another crime, was previously employed, and that his incarceration would entail hardship to his dependent children.

¶ 29    In allocution, defendant apologized for his "actions" and blamed himself for "what happened."

¶ 30    The court stated that it listened to the arguments, considered the victim impact statements, reviewed the presentence investigation report, and was familiar with the statutory factors in aggravation and mitigation. The court acknowledged that it could not adequately communicate "the horror" that Joanna and Bolden experienced or the suffering of Joanna's loved ones. The court then noted that defendant's response to the end of his relationship with Joanna was "unspeakably violent." The court added:

> "A curious circumstance about this, and an aggravating circumstance, is that [Joanna] and [defendant]'s children were not there. You would anticipate that if somebody was just out of control with worked emotions stemming from demise of a relationship to the point they couldn't control themselves, [defendant] might have gone and did what he did without regard to whether the children *** were there or not. The

fact that he went there when they were not there leads me to conclude that this was planned and that he knew that they weren't there and that he went there to engage in this violence at a particular time when he knew they wouldn't be there, which bespeaks a plan to have done this and not something that was done while he was in the throws of particular misery or in the throws of alcohol or some substance, but that he planned to do this and planned to do it in the manner in which it was effectuated. That's what makes all this particularly aggravating, on top of the particularly aggravating manner in which [Joanna] was compelled to die at the hands of her children's [father] in her own home being stabbed again and again and again."

¶ 31    The court stated that defendant "did not operate under any strong provocation as recognized by the law," and that the factors in aggravation were "substantial." Thus, while noting that defendant was eligible for a term of natural life, the court imposed a sentence of 60 years' imprisonment for first degree murder (count IX),[6] 10 years' imprisonment for home invasion with specific findings of severe bodily injury and great bodily harm (count XVI), and five years' imprisonment for aggravated battery of Bolden (count XXIV), to be served consecutively.

¶ 32    Defense counsel filed a motion to reconsider sentence, arguing in relevant part that the sentence was excessive in light of the "facts of this case," defendant's "background," and the age of his prior convictions. The trial court denied the motion.

---

[6] The trial court did not impose sentence on count VI.

¶ 33    On appeal, defendant first argues that his total sentence of 75 years' imprisonment is excessive, particularly where the trial court noted after the Rule 402 conference that it believed a sentence of 40 years' imprisonment was sufficient.

¶ 34    When sentencing a defendant, the trial court must consider both "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *People v. Hernandez*, 2016 IL 118672, ¶ 9. The trial court has broad discretionary powers in imposing a sentence, and its decisions are entitled to great deference because of its superior position to consider the relevant factors, such as the defendant's credibility, demeanor, moral character, mentality, social environment, habits, and age. *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). Thus, a sentence that falls within the statutory range is presumed proper, and will not be disturbed absent an abuse of discretion. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. A sentence constitutes an abuse of discretion where it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *Alexander*, 239 Ill. 2d at 212. A reviewing court "must not substitute its judgment for that of the trial court merely because it would have weighed [the] factors differently." (Internal quotation marks omitted.) *Id.* at 213.

¶ 35    Here, defendant was convicted of first degree murder, home invasion, and aggravated battery. First degree murder has a sentencing range between 20 and 60 years' imprisonment (730 ILCS 5/5-4.5-20(a) (West 2012)), or if the murdered individual was killed by the defendant in the course of another felony, natural life in prison (730 ILCS 5/5-8-1(a)(1)(b) (West 2012)). As charged here, home invasion is a Class X felony (720 ILCS 5/19-6(c) (West 2012)) with a sentencing range between 6 and 30 years' imprisonment (730 ILCS 5/5-4.5-25(a) (West 2012)).

Aggravated battery predicated on great bodily harm, as charged here, is a Class 3 felony (720 ILCS 5/12-3.05(h) (West 2012)) with a sentencing range between two and five years' imprisonment (730 ILCS 5/5-4.5-40(a) (West 2012)). Because each of defendant's sentences falls within its respective statutory range, his 75-year combined sentence is presumed to be proper. See *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 36     Furthermore, we are not persuaded that the trial court abused its discretion in imposing sentence. The evidence at trial established that defendant broke into Joanna's home and attacked her boyfriend, Bolden, while he was sleeping, causing a sprained shoulder, a fractured bone in his eye, and a swollen nose and lip. Defendant then beat Joanna, causing blunt force injuries to her head, neck, chest, and extremities, as well as orbital fractures around her eye bones. Defendant stabbed Joanna approximately 30 times in her head, face, neck, and chest. Defendant refused to let police into the apartment, and when he was arrested, yelled that Joanna deserved what happened to her because she had relations with Bolden. At sentencing, the State emphasized defendant's prior misdemeanors, and Bolden and Joanna's sister submitted victim impact statements which expressed their continued suffering as a result of defendant's crime. The court also heard that defendant had previously been employed, had no prior felonies, and was remorseful for his actions. Considering the seriousness of the offense, we cannot say the court abused its discretion in sentencing defendant to terms within the statutory guidelines. See *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 12 ("it is the seriousness of the crime—rather than the presence of mitigating factors—that is the most important factor in determining an appropriate sentence").

¶ 37 Nonetheless, defendant asserts that because the trial court offered him 40 years' imprisonment in exchange for a plea of guilty at a pretrial Rule 402 conference, his total 75-year sentence constituted a penalty for his decision to exercise his right to trial.

¶ 38 "[A] defendant cannot be punished by the imposition of a heavier sentence merely because he exercises his constitutional right to be tried before an impartial judge or jury." *People v. Carroll*, 260 Ill. App. 3d 319, 348 (1992). A trial court may, however, grant "dispositional concessions" in exchange for a plea of guilty. *People v. Moss*, 205 Ill. 2d 139, 171 (2001). "[A] sentence greater than that offered before trial may be explained by the court's consideration of additional evidence regarding the circumstances of the crime admitted at trial." *People v. Brown*, 2018 IL App (1st) 160924, ¶ 14. Thus, we do not presume that a sentence following a trial was imposed as punishment merely because it was greater than the one previously offered. See *People v. Andrews*, 2013 IL App (1st) 121623, ¶ 19. Rather, there must be a clear showing in the record, which exists when a trial court makes explicit remarks concerning the harsher sentence or where the actual sentence is "outrageously higher" than the one offered during plea negotiations. *Carroll*, 260 Ill. App. 3d at 349. In making this determination, we consider the entire record, rather than focusing on a few words or statements of the trial court. *People v. Johnson*, 2018 IL App (1st) 153634, ¶ 18.

¶ 39 Here, we find that defendant's sentence was not punishment for exercising his right to trial. The record shows that the trial court did not make any negative statements concerning defendant's decision to proceed to trial. Instead, at sentencing, the court properly considered the evidence at trial as well as the aggravating and mitigating factors. Moreover, the record does not establish what counts were the subject of the court's offer following the Rule 402 conference and

the court may not have been apprised of all the aggravating circumstances that were adduced at trial. See *Brown*, 2018 IL App (1st) 160924, ¶ 14. Although a 40 year sentence is significantly shorter than a 75-year sentence, considering that defendant was found guilty of first degree murder, home invasion, and aggravated battery at trial, and sentenced within the statutory guidelines for each offense, we cannot say his sentence was "outrageously higher" than the court's pretrial offer. See *Carroll*, 260 Ill. App. 3d at 349. Therefore, defendant has not established that the court penalized him for proceeding to trial.

¶ 40 Defendant also argues the trial court considered an improper aggravating factor at sentencing. Specifically, defendant asserts that the court's comments that defendant planned the murder for a night when his children would not be present was unsupported by the evidence.

¶ 41 Initially, the State contends that defendant forfeited this issue by failing to contemporaneously object or include it in his postsentencing motion. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). Defendant concedes that he failed to expressly raise the issue, but citing *People v. Valadovinos*, 2014 IL App (1st) 130076, asserts that because he is alleging his sentence was excessive in light of the facts of the case, and the alleged error concerns the trial court's reliance on speculation rather than facts, this court should find his claim is preserved for review. See *Valadovinos*, 2014 IL App (1st) 130076, ¶ 51 ("Although [the postsentencing] motion did not explicitly raise the issue of improper aggravating evidence, the motion did touch on the issue of an unfair and excessive sentence, and therefore we find that the issue has been preserved for appeal."). Alternatively, defendant posits that the principles of forfeiture should be relaxed

because the defense was not required to object to an improper factor while the court was pronouncing his sentence, and if forfeiture applies, the issue may be considered as a matter of plain error or ineffective assistance of counsel. Even accepting that defendant preserved this issue for review, however, we find it lacks merit.

¶ 42    To determine whether the trial court relied on an improper factor in imposing sentence, the reviewing court "will not focus on isolated statements but instead will consider the entire record." *People v. Walker*, 2012 IL App (1st) 083655, ¶ 30. Although the trial court is allowed to make reasonable inferences from the evidence at trial (*People v. Robinson*, 2015 IL App (1st) 130837, ¶ 92), it may not rely on mere speculation (*People v. Zapata*, 347 Ill. App. 3d 956, 964 (2004)). "A cause must be remanded for resentencing only where the reviewing court is unable to determine the weight given to an improperly considered factor." *People v. Beals*, 162 Ill. 2d 497, 509 (1994). The trial court's consideration of an improper factor is an abuse of discretion (*People v. Minter*, 2015 IL App (1st) 120958, ¶ 147), but whether the court considered an improper factor is a question of law reviewed *de novo* (*People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49).

¶ 43    Here, the trial court did not rely on an improper factor at sentencing. Bolden testified that Joanna's children were at their grandparents' home on the night of defendant's attack. There was a series of text messages on September 7 and 8, 2013, from a phone associated with an email address containing defendant's first name and last initial to a contact named Joanna, asking if she was with "johnny." This supports the inference that defendant wanted to know whom Joanna was with at that time. Jon and Jose testified that defendant continued to visit with the children after he and Joanna separated, which demonstrated that defendant could have had some concept

of his children's whereabouts on the date of the offenses. Therefore, the court's comments regarding defendant's timing of his attack were reasonable inferences formulated from the evidence properly before it.

¶ 44     We further note that defendant's reliance on *Zapata* misplaced. In *Zapata*, although the record did not contain evidence that the offense at issue was gang-related, the sentencing court relied on its personal distaste for gang violence as the predominant aggravating factor. *Zapata*, 347 Ill. App. 3d at 966. In contrast to *Zapata*, here the court made a proper inference from the evidence presented at trial and at sentencing regarding defendant's relationship to his children and his questions to the victim on the night of the offense. Accordingly, we find no error. Consequently, to the extent defendant may have forfeited the issue, he would not be entitled to relief as a matter of plain error. See *People v. McGee*, 398 Ill. App. 3d 789, 794 (2010) ("[w]ithout reversible error, there can be no plain error"). Additionally, because there was no error, defendant cannot establish a claim for ineffective assistance of counsel. See *People v. Cox*, 2017 IL App (1st) 151536, ¶ 52.

¶ 45     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 46     Affirmed.