2020 IL App (1st) 171872-U

No. 1-17-1872

Order filed October 30, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 15900 |
| | ) | |
| AMIR LJEVAKOVIC, | ) | Honorable |
| | ) | Paul S. Pavlus, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Delort and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions for home invasion and aggravated kidnapping are affirmed over his contentions that the trial court abused its discretion in admitting evidence of a prior instance of domestic violence by him, and that his sentence is excessive.

¶ 2    Following a bench trial, defendant Amir Ljevakovic was convicted of home invasion and aggravated kidnapping and sentenced to concurrent terms of 15 years' imprisonment, in connection with a September 9, 2015 incident involving his ex-girlfriend, Selma Filan. On appeal, defendant contends that the court erred in admitting evidence of a February 2015 incident

involving him and Filan. He also claims that his sentence was excessive. For the following reasons, we affirm.

¶ 3    Defendant was charged by indictment with two counts of home invasion (720 ILCS 5/19-6(a) (West 2014) (counts I and II); three counts of aggravated kidnapping  (720 ILCS 5/10-2(a) (West 2014) (counts III, IV, and V), and one count of aggravated unlawful restraint (720 ILCS 5/10-3.1a (West 2014) (count VI). In a separate complaint, defendant was also charged with misdemeanor domestic battery and aggravated assault.

¶ 4    Before trial, the State filed a motion to admit proof of other crimes, relating to defendant's February 2015 arrest "for causing bodily harm to Selma Filan by pulling her hair and striking her in the face with his closed fist." The State argued that this evidence was relevant to issues of identity, motive, intent, continued hostility, and propensity to commit domestic violence. The State subsequently supplemented that motion, seeking to admit evidence of an additional incident in 2013 also involving Filan. The court granted the State's motion with respect to both prior incidents. In so doing, the court noted that the "test" for admission of such evidence involves consideration of the "proximity in time, the degree of factual similarity" and that "the bottom line is always whether the probative value cannot outweigh the prejudicial effect." The court noted the "overriding fact" that both prior incidents involved the same victim, and further explained:

>  "On the February 14, 2015, that's some nine months before the September 9 incident. The facts once again, very similar in nature. The allegations, the argument is always – both in 2013, 2015 and the September 9 case and the February 14 allegations, it's always arising out of the jealousy of there may be a possible other

individual that the alleged victim is involved in. And that argument always escalates into some type of beating in the face, always behind closed doors.

And I find that the fact pattern is very similar in both the February 14, 2015, and the September 9. * * * Once again, it's the same victim. So based on the time, the degree of factual similarity * * * absolutely both of these events will be admitted into evidence."

¶ 5 At defendant's 2017 bench trial, Filan testified that she is originally from Bosnia and lives in Skokie. In 2012, she met defendant, who is also from Bosnia. They dated from August 2012, until December 2012. Filan later began dating a man named Hasid.

¶ 6 In February 2013, when Filan went to the office where she worked as an insurance agent, she saw "hearts on my office all over" saying "I love you, I miss you." She called Hasid, who denied writing the messages. A short time later, Filan noticed defendant inside her office. While she was speaking to a client on the office phone, she asked defendant to bring her cell phone from another room. She then heard a smashing sound coming from the back of the office. Defendant then grabbed her tightly by the arm, and she saw blood on his hand. Defendant told her "you're going with me" and "you don't have your phone anymore." Defendant took Filan into a car, where she saw a gun. He began driving with her and stopped to buy her a new phone. He then drove her to his home, where he pushed her, grabbed her around the neck and made "hickey" marks on her neck and arms with his mouth.

¶ 7 Filan and defendant subsequently resumed dating. For a time, their relationship was "better." However, defendant eventually became "more aggressive" toward her. Filan described an incident on February 14, 2015. At that time, defendant lived in an apartment on North Albany

Avenue in Chicago, and he also owned a bar and restaurant across the street. That evening, Filan, defendant, and a number of others were at the restaurant, drinking and listening to live music. Around 11 p.m., a woman named Zorica Ripa arrived, who started saying negative things about Filan. Filan asked defendant to say something to Ripa, but he declined to do so.

¶ 8       After Ripa left, Filan asked another man at the restaurant about Ripa. When she did so, defendant pushed her head into the countertop of the bar. He said "I told you don't talk about that" and started hitting Filan. She called police while a friend restrained defendant. Filan identified photographs of her face, head, and arms after the incident (People's Exhibits 19 through 23). She testified that the photographs showed injuries to her nose and forehead from striking the countertop, as well as bruises on her arms.

¶ 9       Defendant was arrested after the February 2015 incident. Filan wanted to press charges, but defendant's friends and family persuaded her not to do so. Defendant later apologized, and they resumed dating. Filan denied that defendant ever lived with her.

¶ 10      On August 31, 2015, Filan and defendant broke up. On September 8, 2015, Filan was at her condominium with her son and daughter. Filan's friend Zelnel Mustafa visited that evening, and they sat on her balcony talking and drinking. The next morning, September 9, Filan took a shower after her children left for school. When she came out of the shower, defendant was standing by the bathroom door, holding a knife. He told her "today is your funeral, today is your last day." He asked her why Mustafa was there the night before and accused her of having a relationship with him.

¶ 11      Defendant kicked Filan's legs and she fell on the floor. She told him that he could check her text messages; defendant brought her cell phone from another room and asked her to unlock

it. After she did so, he grabbed her arms and moved her into the bedroom. At one point the knife fell, and Filan used her foot to push it beneath a cabinet. He put her on the bed and straddled her with his knees, holding her down and hitting her in the face.

¶ 12    The next thing Filan remembered was standing by the bedroom window. Defendant held her by the neck with one hand while he looked at her phone. At one point she told him that her son was coming home from school early; defendant responded that "he will find your body right here."

¶ 13    Filan eventually asked to get something from the refrigerator; defendant walked with her to the kitchen, as he continued to look at her phone. Filan grabbed a bottle of beer, told defendant that the bottle opener was on the balcony, and asked him to get it for her. When he went to the balcony, she left the condominium, ran downstairs, and exited the building. Filan approached a vehicle and asked the driver to call police. As she did, she heard defendant saying "[e]verything is okay" and not to make a "bigger problem." Defendant then ran to his car and drove away.

¶ 14    After police arrived, they photographed Filan and the rooms of her residence. She discovered that her phone was missing. Filan identified photographs of the various rooms of her residence, including a photograph of a knife in her bathroom. She identified photographs of her face, body, arms and legs, and pointed out a number of bruises and sores from defendant hitting her. Filan also identified security camera footage (People's Exhibit 5) showing defendant entering her building at 8:01 a.m., Filan running out of the building at 9:07 a.m., and defendant leaving the building at 9:10 a.m. Filan identified a number of photographs of defendant following his arrest. She acknowledged that they showed scratches on defendant, but she denied that she caused them.

¶ 15    Edin Mehanovic testified that he was driving when he was stopped by a woman holding a beer bottle. Her face was red and bruised, and she told him to call police. She gestured toward a man who was running away. Mehanovic called 911.

¶ 16    Suljo Sivac, a friend of defendant, testified that defendant called him on September 9, 2015, and told him he had an argument with Filan. Defendant asked Sivac to speak to Filan on his behalf. In text messages that evening, defendant told Sivac that he was in big trouble, and that police were going to arrest him. In one of the text messages, defendant told Sivac that he would not be able to reach Filan by telephone because she "does not have a phone."

¶ 17    Daniella Zippershtein, who had known defendant for several years, testified that defendant called her on September 9 and told her "something bad happened." Defendant gave Filan's address to Zippershtein and asked her to check on Filan. Zippershtein went to the address and saw police.

¶ 18    Zenel Mustafa testified that he visited Filan on the evening of September 8, 2015. The next day, he went to her residence after she met with police. Filan had bruises on her face and arms, a puffy lip, and a cut on the bridge of her nose. The State rested its case in chief.

¶ 19    Defendant testified that prior to September 2015, he was in a relationship with Filan for four years and that he lived with Filan and her children in Skokie. He testified that in February 2013, he went to her office because she called and asked him to meet there to discuss their relationship. He recalled that he bought her a new phone that day, because she told him that her phone was broken. He denied that he threatened her.

¶ 20    Defendant acknowledged that he previously owned an apartment in Chicago. On February 14, 2015, he met Filan at the apartment and they went to his restaurant, where she had several

drinks. A number of other people were there, including Zorica Ripa. Filan asked defendant to tell Ripa to leave. He declined to do so and told Filan to calm down and not pay attention to Ripa.

¶ 21    Sometime after Ripa left, Filan stood up on a bar stool and swore at a man at the bar. When defendant tried to calm her down, she "started spilling wine on the floor" and "hit the wall with the glass." According to defendant, he told her "why do you care what anybody says about you if I don't care." She then "jumped up and said, since you don't care, I don't care, I'll call the police now." Filan then went to the kitchen while defendant stayed near the bar. A waiter then told him that Filan "fell in the kitchen." Defendant was arrested, but his case was later dismissed.

¶ 22    Defendant testified that his relationship with Filan continued into August 2015. On August 31, 2015, around 5:30 a.m. he noticed there was a message and a call on Filan's phone. She called someone and started talking about selling insurance, which he thought was unusual given the time of day. He told her he suspected that there was "some relationship going on here." They discussed the call that evening, and Filan told him "don't worry about it; it's no reason to get you upset."

¶ 23    Later that week, Filan became upset that defendant was spending too much time playing pool with his friends. After September 6, he did not stay in her condominium, because he and Filan were "both very upset." He denied that she ever asked him to return his keys to the residence.

¶ 24    On the morning of September 9, defendant went to the condominium to "talk to [Filan] about our relationship." He heard her in the shower and waited for her in the bedroom. After she came out of the shower, they began talking. She told him that she was not cheating on him and that he could check her phone if he did not believe her. He checked her phone, found "[m]essages that [he] didn't like" from a man, and accused her of cheating on him. Defendant testified that Filan became upset and yelled, and that he "couldn't listen to this anymore." He admitted that he

slapped her five or six times as they were sitting on the bed; Filan also slapped and scratched him. He denied that he held her by the arms or that he held a knife. He identified People's Exhibits 69 through 78 as photographs of himself showing scratches on his face that Filan inflicted.

¶ 25    According to defendant, after the fight, Filan calmed down and told him "it's never going to happen again." At one point, Filan left the bedroom; as he waited for her, he discovered "some other issues that I found in her phone that I wanted to ask her about." He then saw her leaving the kitchen with a beer bottle. She asked him to look for the bottle opener on the balcony. When he came back from the balcony, he could not find her. He eventually exited the building and saw her outside. When he told her to calm down, she responded "you're going to see who Selma is now. I'm going to f*** your mother; now you're going to see my connections with the police."

¶ 26    Suvo Sivac, a friend of defendant, testified that he was at the restaurant on February 14, 2015.  He recalled that Filan was drunk and threw a glass of wine against the wall. Filan argued with defendant, said she was calling police, and ran into the kitchen. Sivac did not see defendant strike Filan.

¶ 27    Zorica Ripa testified that she was a friend of defendant's and was at his restaurant on February 14, 2015. Filan appeared to be drunk and gave Ripa a look when she came in. Later, Filan was carrying "a glass of wine spilling it deliberately" and talking loudly about Ripa, while defendant tried to calm Filan down. Ripa left without saying anything to Filan.

¶ 28    Almira Ljevakovic, one of defendant's daughters, testified that defendant was living with Filan in Skokie as of September 2015, although she never visited their residence. On the morning of September 9, 2015, her father called her and asked her to pick him up. She saw that he had "scratches all over him" and was acting nervous.

¶ 29    The parties stipulated that Skokie Police Officer Duerig would testify that he met with Filan on September 9, 2015 and saw no signs of forced entry to her residence. Filan told Duerig that she had not heard from defendant for over a month until that morning.

¶ 30    In rebuttal, the State called detective Andrew Lehmann of the Skokie Police Department, who was in Filan's condominium on September 9, 2015. Lehmann did not see any male toiletries in the bathroom or any male clothing in the master bedroom.

¶ 31    The State also admitted recordings of defendant's telephone conversations from jail (which were translated from Bosnian by an interpreter). In one of those calls, defendant told a friend named Nesid that one evening he had watched Filan on her balcony drinking with a man. The next day, he returned to her residence and confronted her. In the call, defendant said he and Filan were "wrestling each other, like hitting each other." Defendant said that he later brought her coffee and mistakenly "took a knife instead of a spoon, so she can mix her coffee." After they spoke about their relationship, she ran out of the apartment and began stopping cars. Defendant ran when he realized that she was going to call the police. During the same call, defendant stated he looked at Filan's phone and saw that she had been texting another man.

¶ 32    In its findings, the court found that Filan was credible and remarked that defendant and Filan had a relationship that was "plagued by jealousy" and "controlling behavior." The court noted the testimony about the February 2013 incident where defendant went to Filan's workplace and broke her phone. The court also cited the February 2015 incident, finding that Filan wanted to confront another woman but defendant "in his controlling nature" "restrained [Filan] from talking to her," "grabbed her by the arms" and "battered her." The court further found that on September

9, 2015, defendant entered Filan's residence without permission, threatened her with a knife, and restrained her. The court found defendant guilty of all charged counts.

¶ 33     Defendant filed a posttrial motion to reconsider or alternatively for a new trial, which was denied.

¶ 34     Defendant's presentence investigative report (PSI) reflects that he was born in 1971 in Bosnia and moved to the United States when he was 24. Defendant was married in 1998 and divorced in 2000. He has two daughters, ages 20 and 17 years old, who resided with their mother. Defendant had a good relationship with his daughters, for whom he paid child support and school expenses. Regarding his work history, defendant reported that he operated a construction business for many years and worked as a property manager for two different apartment buildings. He also purchased a restaurant in Chicago and planned that his daughter would eventually manage it. The PSI reflects no criminal history, other than a $500 fine in 2015 for violation of a licensing requirement for a retail establishment.

¶ 35     At defendant's sentencing hearing, Filan read a victim impact statement. She described seeing defendant as she emerged from the shower as the "most horrific" feeling of her life and a memory that will not leave her. She had been prescribed medicine for post-traumatic disorder and was hospitalized for chest pain "caused by stress and trauma due to the incident." She described constant fear and could no longer shower when she was home alone. She had difficulty sleeping, experienced nightmares and constantly checked that her residence was locked. Filan also stated that her children no longer felt safe.

¶ 36     Filan further stated that she had received threats from defendant's family and friends, which contributed to her fear. Filan also suffered financially due to the incident. She had owned

an independent insurance agency, but her job became "impossible" because she no longer felt safe going to her office. She closed her agency and put her home on the market. She said the incident "wasn't one that had short-term result for me" and that defendant had disrupted her whole life.

¶ 37    The State noted that both home invasion and aggravated kidnapping were Class X offenses, each of which carried terms of 6 to 30 years' imprisonment.[1] The State requested that the court impose discretionary consecutive sentencing on the home invasion and aggravated kidnapping offenses to protect the public from further conduct by defendant. The State argued in aggravation that defendant's conduct caused serious physical and emotional harm, as illustrated by Filan's victim impact statement. The State further argued that, although the PSI did not reflect a criminal history, the "abuse and intimidation that he inflicted on Selma Filan for several years was ongoing, systematic, and continuous."

¶ 38    In mitigation, defense counsel read a letter by defendant's oldest daughter stating that he was an excellent and supportive father. The defense also submitted letters from two of defendant's friends, Zorica Ripa and Biljana Vuci, who stated that defendant was a good person who made a mistake but regretted his actions.

¶ 39    Defense counsel argued that this was a "crime of passion" and that defendant's testimony showed that he was remorseful. Counsel otherwise argued that defendant is a hardworking and productive member of society who supported his daughters. Emphasizing his lack of criminal background, counsel requested the minimum sentence.

¶ 40    Asked whether he wished to speak in allocution, defendant stated only: "What can I say?"

---

[1] The State acknowledged that the home invasion counts (counts I and II) merged, the aggravated kidnapping counts (counts III, IV, and V) merged, and that aggravated unlawful restraint (count VI), was a lesser included offense of aggravated kidnapping.

¶ 41     In sentencing, the court first stated that the home invasion counts (counts I and II) "merge together" and that the aggravated kidnapping counts (counts III, IV, and V) also "merge together." The court further noted that aggravated unlawful restraint (count VI) was a lesser included offense of aggravated kidnaping. Thus, the court stated that it was "mak[ing] a decision on really counts III, IV, and V, which merge together as one, and also counts I and II, which merge together as one." The court also noted that in its discretion, it could impose consecutive sentences.

¶ 42     The court remarked: "What I take away from Selma Filan's statement the most is one sentence. This accident wasn't one that had short-term result for me. This accident has left me to deal with the impossible for the rest of my life." The court commented that "fear is the most overwhelming emotion a person can deal with" and that the rest of Filan's life would never be the same, noting the impact on her children and business. The court concluded:

> "Well, based on everything I heard, based on his non-criminal background, I think the appropriate sentence on the merged Counts I and Count II is 15 years in the Illinois Department of Corrections. On Count[s] III, IV, and V, 15 years in the Illinois Department of Corrections. That will run concurrent. That's this court's decision."

¶ 43     The trial court did not specify on the record which of the two home invasion counts (counts I and II) would merge into the other and on which count it was imposing sentence. The court also did not specify which two of the three aggravated kidnaping counts (counts III, IV, and V) would merge into the third and on which count it was imposing sentence. The written sentencing order mirrors the court's comments on merger and reflects that "counts 01 & 02 are merged" and that "counts 03, 04 & 05 are merged." However, the order elsewhere indicates that a 15-year sentence

was imposed on each of the home invasion counts (I and II), as well as each of the aggravated kidnaping counts (III, IV, and V).[2]

¶ 44    Defendant did not file a motion to reduce sentence before filing a notice of appeal.

¶ 45    Defendant makes two arguments on appeal. First, he avers that the trial court erred in permitting the State to permit other-crimes evidence of the prior incident of domestic violence against Filan on February 14, 2015.[3] In the alternative, he claims that his 15-year sentence was excessive.

¶ 46    We first address defendant's claim that the trial court abused its discretion in permitting evidence of the February 14, 2015 incident at defendant's restaurant. Defendant maintains that the nature of this incident was "far different" from his alleged acts on September 9, 2015, such that evidence of the February 2015 incident was "far more prejudicial than probative." On that basis, he requests reversal of his conviction.

¶ 47    Under the common law, proof of other crimes is generally not admissible to show the defendant's propensity to commit crime. *People v. Pikes*, 2013 IL 115171, ¶ 11; see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith" but may be admissible for other purposes.). However, in domestic violence prosecutions, an exception to the common law rule is created by section 115-7.4 of the Code of Criminal Procedure (Code) (725 ILCS 5/115-7.4 (West 2014)), which provides that "evidence of the defendant's commission of

---

[2] The sentencing order makes no mention of the findings of guilt for aggravated unlawful restraint (count VI) or the misdemeanor charges of domestic battery and aggravated assault.

[3] Defendant raises no argument regarding admission of the evidence of the 2013 incident.

another offense or offenses of domestic violence is admissible and may be considered for its bearing on any matter to which it is relevant." Although the statute creates an exception to the common law rule barring propensity evidence, such other-crimes evidence may still be excluded if the court determines that the risk of undue prejudice from such evidence outweighs its probative value. *People v. Dabbs*, 239 Ill. 2d 277, 290 (2010). In weighing the probative value of the evidence against undue prejudice, the court may consider: (1) the proximity in time to the charged offense; (2) the degree of factual similarity to the charged offense; or (3) other relevant facts and circumstances. 725 ILCS 5/115-7.3 (West 2014).

¶ 48     We review a ruling on a motion to admit other-crimes evidence for an abuse of discretion. *People v. Peterson*, 2017 IL 120331, ¶ 125. Under this standard, "[t]he question is not whether the reviewing court would have made the same decision if it were acting as the trial court. Rather, the question is whether the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *Id.* We will not reverse the trial court's ruling absent "a clear abuse" of its discretion. *Id.*

¶ 49     In arguing that the court abused its discretion in permitting evidence of the February 2015 incident, defendant acknowledges that the prior incident "occurred reasonably close in time" to the charged offenses in September 2015. Nevertheless, he maintains that its prejudicial effect outweighed its probative value due to "significant differences" between the incidents. He points out that the February 2015 incident was brief and occurred in a public place in the presence of others, whereas the charged offenses occurred in Filan's home over a time span of approximately one hour. He also states that the February 2015 incident was "not planned in advance," whereas

the State argued that defendant planned to come to Filan's residence on the morning of September 9, 2015, when he knew she would be alone, after having observed her the prior evening.

¶ 50 After reviewing the record, we find the trial court did not abuse its discretion in admitting evidence of the February 2015 incident. Although there were clear factual differences between the February 2015 and September 2015 incidents in terms of their setting and duration, the trial court recognized a central similarity – the victim of the violence was the same person. As the court recognized, both sides presented evidence of a long, tumultuous relationship between defendant and Filan. The court could certainly find that defendant's violence toward the same person nine months earlier (even in a public setting) was probative of his propensity to commit violence against her in her residence. Moreover, the circumstances of the February 2015 incident illustrated defendant's pattern of using force against Filan to control her. Given this record, we cannot say that the trial court's decision to admit the February 2015 incident is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *Peterson*, 2017 IL 120331, ¶ 125.

¶ 51 In reaching this conclusion, we reject defendant's suggestion that this case is analogous to *People v. Johnson*, 406 Ill. App. 3d 805 (2010), which concerned the admission of other crimes evidence in a sex offense case pursuant to section 115-7.3 of the Code (725 ILCS 5/115-7.3(c) (West 2006)). At the *Johnson* defendant's trial for sexual assault of T.W. in March 2002, the trial court permitted evidence of a November 2003 sexual assault committed by the defendant and a second unidentified perpetrator against a different victim, C.V. *Johnson*, 406 Ill. App. 3d at 807-08. The assault against C.V. further differed from T.W.'s in that C.V. was pulled into a car, and C.V.'s assault included anal penetration. *Id.* at 812. Due in part to the "significant dissimilarities"

between the two offenses, this court concluded that admission of the assault against C.V. was error. *Id.* at 812. In this case, the use of the February 2015 incident in defendant's case bears no resemblance to the situation in *Johnson*. Here, unlike in *Johnson*, the uncharged February 2015 offense involved the same victim, the same sole perpetrator (defendant), and was also much closer in time to the charged offenses.

¶ 52    We further note that any risk of potential prejudice from the admission of the February 2015 incident was reduced by the fact that defendant was convicted following a bench trial and not a jury trial. See *People v. Nash*, 2013 IL App (1st) 113366, ¶ 24 ("The rule generally barring other-crimes evidence is based on the belief that the introduction of the evidence may over-persuade a jury to convict a defendant only because the jury believes the defendant is a bad person deserving punishment. [Citation.] In a bench trial, this fear is assuaged; it is presumed that the trial court considered the other-crimes evidence only for the limited purpose for which it was introduced. [Citation.]"). As we find no error in the trial court's admission of evidence of the February 2015 incident, we need not address the parties' arguments as to whether there was harmless error.

¶ 53    We next consider defendant's argument that his aggregate 15-year sentence was excessive. Defendant recognizes that he did not preserve the issue for review because he did not move to reconsider the sentence. See *People v. Hillier*, 237 Ill.2d 539, 545 (2010) (to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required). Nonetheless, he urges that we review the issue under the plain-error doctrine, which "bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *People v. Thompson*, 238 Ill. 2d 598, 613

(2010). Alternatively, defendant contends that his trial counsel's failure to preserve his excessive sentence claim constitutes ineffective assistance of counsel.

¶ 54    To obtain relief under the plain-error doctrine, "a defendant must first show that a clear or obvious error occurred. [Citation.] In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. [Citation.]" *Hillier*, 237 Ill.2d at 545. Defendant contends that he is entitled to relief under either prong. However, "[t]he first step of plain-error review is determining whether any error occurred." *Thompson*, 238 Ill. 2d at 613. Thus, we first consider whether the trial court erred at sentencing.

¶ 55    Under the Illinois Constitution, the trial court must impose a sentence that balances the seriousness of the offense and the defendant's rehabilitative potential. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. In doing so, the court must consider aggravating and mitigating factors including "the nature and circumstances of the crime, the defendant's conduct in the commission of the crime and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment and education." *Id.* Because the trial court is in the best position to weigh these factors, the sentence imposed will not be reversed absent an abuse of discretion. *Id.* The reviewing court "must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *People v. Stacey*, 193 Ill.2d 203, 209 (2000). "A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20.

¶ 56    After reviewing the record in this case, we do not find that defendant's sentence was excessive. First, the 15-year sentence was well within statutory limits. Home invasion and aggravated kidnaping, as charged in this case, are both Class X felonies. 720 ILCS 5/19-6(a), (c) (West 2014); 720 ILCS 5/10-2(a) (West 2014). A Class X felony carries a sentence of not less than 6 years and not more than 30 years. 730 ILCS 5/5-4.5-25 (West 2014).  In turn, a sentencing range of 6 to 30 years applied to his conviction for home invasion (under merged counts I and II), as well as to the aggravated kidnapping offenses (under merged counts III, IV, and V).[4] Further, the trial court was empowered to impose consecutive sentences, if it found that consecutive sentences were required to protect the public from further criminal conduct. 730 ILCS 5/5-8-4(c)(1) (West 2014). Thus, the aggregate sentencing range was between six years (if the court imposed concurrent minimum sentences) and 60 years (if the court imposed consecutive maximum 30-year sentences).

¶ 57    As the 15-year sentence was within the statutory range, it is presumed to be proper and "will not be disturbed absent an affirmative showing that the sentence is at variance with the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense." *Knox*, 2014 IL App (1st) 120349, ¶ 46. Defendant cannot make that showing. He acknowledges that the offenses were "undoubtedly serious and had a significant impact" on Filan and her family. Nonetheless, he contends that "the length of [his] sentence shows that the judge abused his discretion by not affording more weight to the significant mitigating evidence" found in the PSI. He emphasizes his long employment history, his positive relationship with his daughters, and his payment of child support and educational expenses.

---

[4] We note that our review of defendant's excessiveness argument is not impacted by the fact that the trial court's comments at sentencing and the sentencing order did not specify which counts merged into other counts.

¶ 58    In setting forth this argument, defendant recognizes that the trial court is presumed to have considered these mitigating factors, even if it did not mention them in explaining its sentencing decision. *Knox*, 2014 IL App (1st) 120349, ¶ 46 ("[b]ecause a trial court need not explicitly analyze each relevant factor or articulate the basis for the sentence impose, when mitigating evidence is presented before the trial court, it is presumed that the court considered that evidence in imposing the defendant's sentence."). However, he urges that the length of his sentence, "coupled with the significant mitigating evidence, shows that the judge abused his discretion by imposing a sentence two and [a] half times the minimum." We disagree.

¶ 59    Defendant essentially invites us to reweigh the sentencing factors to conclude that his work history and relationship with his daughters warranted a lesser sentence, despite the seriousness of the offense and other aggravating factors. This we cannot do, even if we would have assessed these factors differently than the trial court. *Alexander*, 239 Ill. 2d at 214-15; *Stacey*, 193 Ill. 2d at 209. We further note that the court's mention of defendant's "non-criminal background" indicates that it considered his lack of prior convictions in electing to imposing a term well below the maximum.

¶ 60    Moreover, we note that "[t]he seriousness of an offense, and not mitigating evidence, is the most important factor in sentencing. [Citation.]" *Wilson*, 2016 IL App (1st) 141063, ¶ 11. In this case, the offenses committed were undoubtedly serious. The mitigating evidence regarding defendant's work and family history did not preclude the court from imposing a sentence above the minimum. See *Alexander*, 239 Ill. 2d at 214 (defendant's rehabilitative potential is not entitled to greater weight than the seriousness of the offense); *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123 ("the court is not required to give greater weight to mitigating factors than to the seriousness of the offense"). We further note that, despite defendant's lack of prior criminal

convictions, the court was free to take into account evidence of his prior harmful conduct against Filan, including the February 2013 and February 2015 incidents of violence, as aggravating evidence reflecting negatively on his "demeanor" and "general moral character." See *Alexander*, 239 Ill. 2d at 213. As noted by the court, there was evidence that defendant engaged in a pattern of monitoring Filan and using force to limit her communications with others.

¶ 61    In sum, we cannot say the 15-year sentence was greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offenses. In other words, there was no abuse of discretion. As there was no error in sentencing, we need not additionally discuss whether either prong of plain error review applies. See *People v. Williams*, 2017 IL App (1st) 150795, ¶ 40 ("There was no error, let alone 'plain' error, and so we need not go further in the plain error analysis.").

¶ 62    Similarly, we reject defendant's suggestion that his trial counsel was ineffective for failing to properly preserve a challenge to his sentence. A defendant alleging ineffective assistance of counsel must prove prejudice, such that "absent counsel's deficient performance there is a reasonable probability that the result of the proceeding would have been different." *People v. Evans*, 209 Ill.2d 194, 219-20 (2004) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). As we have determined that the trial court did not abuse its discretion in imposing sentence, defendant cannot demonstrate any reasonable probability that the result would have been different, even had his trial counsel preserved the issue. See, e.g., *People v. Brown*, 2017 IL App (1st) 142877, ¶ 66 (counsel not ineffective for failing to file motion to reconsider sentence where there was no reasonable probability that the sentence would have been different even if motion had been filed). As defendant cannot demonstrate prejudice, his claim of ineffective assistance is without merit.

¶ 63    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 64    Affirmed.